**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| BORIS BORETSKY, | : | **Hon. Freda L. Wolfson** |
| | : | |
| Petitioner, | : | Civil No. 09-0771 (FLW) |
| | : | |
| v. | : | |
| | : | |
| MICHELLE R. RICCI, et al., | : | **O P I N I O N** |
| | : | |
| Respondents. | : | |

**APPEARANCES**:

> BORIS BORETSKY, #946903A
> New Jersey State Prison
> P.O. Box 861
> Trenton, New Jersey 08625
> Petitioner Pro Se

> NANCY A. HULETT, Assistant Prosecutor
> BRUCE J. KAPLAN, MIDDLESEX COUNTY PROSECUTOR
> 25 Kirkpatrick Street, 3d Floor
> New Brunswick, New Jersey  08903
> Attorneys for Respondents

**WOLFSON**, District Judge:

Boris Boretsky filed a Petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. §
2254, challenging a judgment of conviction entered in the Superior Court of New Jersey,
Middlesex County, on April 7, 2006, after a jury found him guilty of the first-degree murder of
his wife Saoule Moukhametova ("Lana"), felony murder, aggravated assault, burglary, terroristic
threats, and other related crimes.  Respondents filed an Answer arguing that the Petition should
be dismissed as unexhausted and on the merits.  Petitioner filed a Reply.

Petitioner thereafter filed a motion to amend the Petition to add the ineffective assistance of counsel claims presented in his first state petition for post-conviction relief filed in the New Jersey Superior Court on April 18, 2011, and to stay the § 2254 Petition. The State filed opposition, arguing that Petitioner has not shown grounds warranting equitable tolling, and Petitioner filed a response.  For the reasons expressed below, this Court will deny Petitioner's motion to amend and for a stay, dismiss the Petition on the merits, and deny a certificate of appealability.[1]

## I.  BACKGROUND

On April 7, 2006, after a jury sitting in the Superior Court of New Jersey, Middlesex County, Law Division, found Petitioner guilty of all charges, Superior Court Judge James F. Mulvihill sentenced Petitioner to a term of life imprisonment without parole and a consecutive 23.5 year term.[2]  Petitioner appealed.  In an opinion filed August 28, 2008, the Superior Court of New Jersey, Appellate Division, affirmed the conviction and sentence.  See State v. Boretsky,

---

[1] Respondents argued that certain claims are unexhausted because Boretsky did not raise them before the New Jersey courts as federal claims.  To the extent that Petitioner's claims are unexhausted, this Court will deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").  See Taylor v. Horn, 504 F. 3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of Taylor's claims on the merits, we need not address exhaustion"); Bronshtein v. Horn, 404 F. 3d 700, 728 (3d Cir. 2005) ("We would permit Bronshtein to attempt on remand to establish a reason to excuse his procedural default, but we find it unnecessary to do so because it is apparent that the claims in question lack merit.  Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

[2] The state sought the death penalty, but in the penalty phase, the jury could not reach unanimous agreement on the death penalty.  See State v. Boretsky, 208 WL 4057972 at *1 (N.J. Super. Ct., App. Div., Aug. 28, 2008), certif. den., 197 N.J. 14 (2008) (table).

2008 WL 4057972 (N.J. Super. Ct., App. Div., Aug. 28, 2008).  The New Jersey Supreme Court

denied certification on November 14, 2008.[3]  See State v. Boretsky, 197 N.J. 14 (2008) (table).

The Appellate Division summarized the facts as follows:

> The State's proofs initially focused upon the January 19, 2002, incident that had engendered the TRO [under the Prevention of Domestic Violence Act], in which defendant, in the presence of others, had struck Lana, causing many bruises, a three-centimeter vertical laceration above her left eyebrow, and a broken nose.  In the course of the altercation, defendant had also struck Lana's stepsister.

> On January 31, 2002, the TRO was converted into a consent order continuing the restraint against personal contact and granting Lana exclusive possession of the marital home . . . .  The events established in the proofs included defendant's March 1, 2002, visit to Lana's attorney at her office with angry demands for a resolution of the matter more favorable to him than the then-pending arrangement.

> Two days later, in the evening of March 3, defendant visited the marital home.  At one point during the visit, defendant spoke by telephone with a friend, reporting that Lana was dead.  In response to the friend's question why he had violated the restraining order, defendant said that Lana had called him and invited him over to talk.  Defendant related that they had argued and that Lana had grabbed a knife and threatened to kill either herself or defendant and "now she's dead."  There was no mention of suicide, which defendant later asserted to the police and continued to invoke through trial.  The cause of death was a knife wound above the right breast, near the armpit.

Boretsky, 2008 WL 4057972 at **3-4.

---

[3] The state filed an interlocutory appeal of the Law Division's order suppressing three of Boretsky's statements.  The Appellate Division affirmed, but the New Jersey Supreme Court reversed, holding that the statements did not violate the Self Incrimination Clause.  See State v. Boretsky, 186 N.J. 271 (2006).  This Court will discuss the New Jersey Supreme Court's ruling in Section IV.A., supra.

On February 10, 2009, Petitioner executed the § 2254 Petition before this Court.  The

Clerk docketed it on February 17, 2009.  After this Court notified Petitioner of his rights pursuant

to Mason v. Myers, 208 F. 3d 414 (3d Cir. 2000), Petitioner elected to proceed with the Petition.[4]

The Petition presents the following grounds, which mimic the grounds raised on direct appeal:

> Ground One:  MY 5TH AND 6TH AMENDMENT RIGHTS
> WERE VIOLATED BY THE ADMISSION OF STATEMENTS
> INITIATED BY POLICE AFTER I ASKED THEM TO SPEAK
> TO MY ATTORNEY AND, INSTEAD THEY DISCONNECTED
> MY TELEPHONE CALL TO HIM.
>
> Ground Two:  THE TRIAL COURT'S INSTRUCTION THAT
> JURY COULD CONSIDER EVIDENCE THAT DEFENDANT
> PREVIOUSLY ASSAULTED AND THREATENED HIS WIFE
> AS PROOF THAT HE WAS GUILTY OF MURDER DEPRIVED
> DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.
>
> Ground Three:  THE MEDICAL EXAMINER'S TESTIMONY
> THAT THE CAUSE OF DEATH WAS "HOMICIDE"
> EXCEEDED THE SCOPE OF PERMISSIBLE EXPERT
> TESTIMONY AND IMPROPERLY ADDRESSED THE
> ULTIMATE ISSUE BEFORE THE JURY, THEREBY
> DEPRIVING DEFENDANT OF A FAIR TRIAL AND
> REQUIRING THE REVERSAL OF HIS CONVICTION.
>
> Ground Four:  THE COURT COMMITTED REVERSIBLE
> ERROR IN ITS REFUSAL TO SEVER THE COUNTS
> CHARGING CONTEMPT FOR VIOLATION OF A
> RESTRAINING ORDER.

-------

[4] The Court notified Petitioner that under the Anti-Terrorism and Effective Death Penalty Act a prisoner challenging detention pursuant to the judgment of a state court may file one all-inclusive § 2254 petition within one year of the date the conviction became final and that absent extremely limited circumstances and the approval of the United States Court of Appeals for the Third Circuit, a claim presented in a second or successive § 2254 petition shall be dismissed, see 28 U.S.C. § 2244(b).  In addition, this Court advised Petitioner that it could not grant a writ unless he had exhausted the claims before the New Jersey courts and gave Petitioner the opportunity to withdraw the Petition.  (Dkt. 2.)  On March 6, 2009, Petitioner asked this Court to consider the Petition as his all-inclusive petition.  (Dkt. 4.)

4

Ground Five:  BECAUSE THE STATE FAILED TO PROVE THE
ELEMENTS OF TERRORISTIC THREATS BEYOND A
REASONABLE DOUBT, THE TRIAL JUDGE ERRED IN
DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF
ACQUITTAL ON COUNT TWO.

Ground Six:  DEFENDANT'S BURGLARY AND FELONY
MURDER CONVICTIONS MUST BE REVERSED BECAUSE
THE TRIAL COURT FAILED TO INFORM THE JURY THAT
VIOLATION OF A DOMESTIC VIOLENCE RESTRAINING
ORDER DOES NOT SATISFY THE REQUIREMENTS OF A
"PURPOSE TO COMMIT AN OFFENSE THEREIN."

Ground Seven:  DURING THE TRIAL AND SUMMATION, THE
PROSECUTOR COMMITTED SEVERAL ACTS OF
MISCONDUCT WHICH VIOLATED DEFENDANT'S DUE
PROCESS RIGHT TO A FAIR TRIAL, THE AMENDMENT
XIV OF THE U.S. CONSTITUTION.

Ground Eight:  THE TRIAL COURT COMMITTED
REVERSIBLE ERROR BY ALLOWING THE JURY TO
CONSIDER THAT THE DEFENDANT CAUSED SERIOUS
BODILY INJURIES, OR CAUSED SIGNIFICANT BODILY
INJURIES.  THE JURY'S CONSIDERATION SHOULD HAVE
BEEN LIMITED TO ATTEMPT TO CAUSE SERIOUS OR
SIGNIFICANT BODILY INJURY ONLY.

Ground Nine:  THE TRIAL JUDGE ABUSED HIS DISCRETION
BY ALLOWING THE STATE TO DISPLAY TO THE JURY
PICTURES DEPICTING INJURIES SUSTAINED BY SAOULE
MOUKHAMETOVA ON THE NIGHT OF JANUARY 19, 2002
WHERE THE LEAST POSSIBLE INFLAMMATORY
EVIDENCE TO PROVE THIS POINT WAS AVAILABLE
THROUGH THE TESTIMONY OF DR. GARIBALDI AND
OFFICER DROST.  THUS, DEFENDANT WAS UNDULY
PREJUDICED THEREBY AND WAS DENIED HIS
CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

Ground Ten:  THE ADMISSION OF HEARSAY TESTIMONY
UNDER THE "EXCITED UTTERANCE" EXCEPTION
PROVIDED AT TRIAL BY MARINA MIROSHNICHENKO AS
TO ALLEGED STATEMENTS MADE TO HER BY SAOULE
MOUKHAMETOVA, AND THE DECISION BY THE TRIAL

5

COURT IN A PRE-TRIAL HEARING TO PERMIT THIS
HEARSAY WERE VIOLATIVE OF ESTABLISHED LEGAL
PRINCIPLES AND CASE LAW, AND THUS CONSTITUTED A
GROSS ABUSE OF JUDICIAL DISCRETION CLEARLY
CAPABLE OF PRODUCING AN UNJUST RESULT, AND
DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.

Ground Eleven:  THE IMPROPER INTRODUCTION (AGAINST
TIMELY OBJECTION) OF DOUBLE-HEARSAY (OR
HEARSAY WITHIN HEARSAY) DURING THE CROSS-
EXAMINATION OF DR. UTKIWICZ VIOLATED N.J.R.E. 802,
703(7), 404(b), AND 403, AS WELL AS VIOLATING
DEFENDANT'S RIGHT TO CONFRONT HIS ACCUSER,
THUS DEPRIVING HIM OF HIS RIGHT TO A FAIR TRIAL.

Ground Twelve:  THE TRIAL COURT VIOLATED
DEFENDANT'S RIGHT TO A FAIR TRIAL BY PERMITTING
INTO EVIDENCE THE TESTIMONIAL HEARSAY
STATEMENTS OF SAOULE MOUKHAMETOVA TO JUDGE
MARY CASEY IN DIRECT VIOLATION OF THE
CONFRONTATION CLAUSE OF THE 6TH AMENDMENT OF
THE UNTIED STATES CONSTITUTION . . . , AS WELL AS
DENYING THE DEFENDANT THE EFFECTIVE ASSISTANCE
OF COUNSEL AND THE DUE PROCESS CLAUSE OF THE
U.S. CONSTITUTION.

Ground Thirteen:  THE ALLOWING OF E.M.S. TECHNICIAN
LEMMERLING, A GOVERNMENT OFFICER, TO TESTIFY
CONCERNING A HEARSAY TESTIMONIAL STATEMENT
MADE TO HIM BY SAOULE MOUKHAMETOVA WAS IN
VIOLATION OF THE CONFRONTATION CLAUSE . . . , AND
THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

Ground Fourteen:  DURING JURY SUMMATION, THE TRIAL
JUDGE GAVE THE JURY INCORRECT (AS A MATTER OF
LAW) INSTRUCTION AS TO HOW TO WEIGH THE
EVIDENCE, RELIEVING THE PROSECUTOR FROM ITS
BURDEN OF PROVING ITS CASE BEYOND A
REASONABLE DOUBT.

(Pet. ¶ 12, Grounds One to Fourteen) (Dkt. 1 at 5-12.)

## II.  MOTION TO AMEND PETITION AND FOR STAY

On April 28, 2011, Boretsky filed a motion to stay the Petition while he pursued his first

state petition for post-conviction relief, which he claims was filed on March 8, 2011.  (Dkt. 21-

1.)  On August 15, 2011, this Court denied the motion without prejudice to the filing of a

properly supported motion to amend the Petition.  This Court's Opinion noted that, because

Boretsky's § 2254 Petition does not include the ineffective assistance of counsel claims, a stay

would be of no use to Boretsky unless he first amended his § 2254 Petition to include the

ineffective assistance of counsel claims.  Moreover, since the one-year statute of limitations, see

28 U.S.C. § 2254(d)(1)(A), expired on February 15, 2010, in the absence of equitable tolling, the

Petition could not be amended because the new claims would be time barred.[5]  See 28 U.S.C. §

2244(d)(1)(A).  (Dkt. 22.)  This Court denied the motion for stay without prejudice to the filing

of a motion to amend in which Boretsky showed that equitable tolling of the statute of limitations

was warranted from February 15, 2010, until the date on which Boretsky presumably "properly

filed" his state petition for post-conviction relief, insofar as statutory tolling would kick in on that

date, if the state petition were properly filed.  See 28 U.S.C. § 2244(d)(2) ("The time during

which a properly filed application for State post-conviction or other collateral review with

respect to the pertinent judgment or claim is pending shall not be counted toward any period of

limitation under this subsection"); Allen v. Siebert, 552 U.S. 3 (2007) (petition for state post-

---

[5] Section 2244(d)(1)(A) provides that a § 2254 petition must be filed within one year
from "the date on which the judgment of conviction became final."  Boretsky's conviction
became final on February 12, 2009, upon expiration of his time to file a petition for certiorari in
the Supreme Court.  See Kapral v. United States, 166 F. 3d 565, 575 (3d Cir. 1999).  The one-
year statute of limitations began to run on February 13, 2009, and continued running until it
expired 365 days later on February 15, 2010.

conviction relief that was rejected by the state courts as untimely is not "properly filed" under §
2244(d)(2)); Artuz v. Bennett, 531 U.S. 4, 8 (2000) (petition for post-conviction relief is "filed"
when "it is delivered to, and accepted by, the appropriate court officer for placement into the
official record")  (citations omitted).  This Court's Opinion also explained the contours of the
equitable tolling doctrine in order to guide Petitioner.

On August 30, 2011, Petitioner filed a motion (Dkt. 24) to amend the Petition to add
additional grounds (which were raised in his state petition for post-conviction relief) and to stay
the amended petition while Petitioner pursues state post-conviction relief.  The Amended
Verified Petition for Post-Conviction Relief, which is dated August 25, 2011, raises seven claims
of ineffective assistance of counsel, with subparts:

> Point I:  FAILURE OF THE TRIAL, OR THE APPELLATE COUNSEL TO
> RAISE THE FOLLOWING ISSUES REGARDING THE ASSISTANT
> MIDDLESEX COUNTY MEDICAL EXAMINER DR. FALZON,
> FABRICATING AND/OR TAMPERING WITH PHYSICAL EVIDENCE AND
> MAKING HIS CONCLUSIONS IN THE AUTOPSY REPORT TO FIT THE
> STATE'S THEORY, UTTERLY DEPRIVED DEFENDANT OF HIS FEDERAL
> AND STATE CONSTITUTIONAL RIGHTS TO THE EFFECTIVE
> ASSISTANCE OF COUNSEL, TO DUE PROCESS, AND TO A FAIR TRIAL.
> U.S. Const. Amend. V, VI and XIV.
>
> Point II:  FAILURE OF THE TRIAL, OR THE APPELLATE COUNSEL TO
> RAISE THE ISSUE THAT THE EVIDENCE ("THE DEED) WHICH WAS
> INTRODUCED AT GRAND JURY PROCEEDINGS AND AT TRIAL WAS
> OBTAINED IN VIOLATION OF SEARCH AND SEIZURE PROVISION OF
> THE UNITED STATES CONSTITUTION, UTTERLY DEPRIVED
> DEFENDANT OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS
> TO THE EFFECTIVE ASSISTANCE OF COUNSEL, TO DUE PROCESS,
> AND TO A FAIR TRIAL.  U.S. Const. Amend. IV, V, VI, XIV.
>
> Point III:  FAILURE OF APPELLATE COUNSEL TO RAISE, ON SIXTH
> AMENDMENT AND ON FED. R. EVID. 404(b) AND 703 GROUNDS, THE
> ISSUES OF 1998 INCIDENT AND INTRODUCTION OF CERTAIN PORTION
> OF TRANSCRIPTS OF TESTIMONIAL STATEMENT OF DEFENDANT'S

WIFE MADE TO MUNICIPAL JUDGE MARY CASEY, UTTERLY
DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF
COUNSEL, TO DUE PROCESS, AND TO A FAIR TRIAL.  U.S. Const. Amend.
V, VI and XIV.

Point IV:  FAILURE OF THE TRIAL, OR THE APPELLATE COUNSEL TO
RAISE THE FOLLOWING ISSUE[S] AT TRIAL, OR ON DIRECT APPEAL,
DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF
COUNSEL, TO DUE PROCESS, AND A FAIR TRIAL.  U.S. Const. Amend. VI,
XIV.

    A.  FAILURE OF TRIAL, OR THE APPELLATE COUNSEL TO
OBJECT TO JURY INSTRUCTION TO RETURN GUILTY VERDICT
ON CHARGE OF MANSLAUGHTER IF DEFENDANT CAUSED
DEATH IN THE HEAT OF PASSION PLACED ON DEFENDANT
BURDEN OF PROVING PASSION/PROVOCATION AND
DISPROVING AGGRAVATED OR RECKLESS MANSLAUGHTER,
DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF
COUNSEL. TO DUE PROCESS, AND A FAIR TRIAL.  U.S. Const.
Amends. VI, XIV.

    B.  FAILURE OF TRIAL COUNSEL TO OBJECT TO JURY
INSTRUCTIONS PROVIDING THAT CONVICTION FOR
BURGLARY COULD BE BASED UPON DEFENDANT'S
DISOBEDIENCE OF COURT ORDER NOT TO ENTER HIS HOUSE,
DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE
CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF
COUNSEL, TO DUE PROCESS, AND A FAIR TRIAL.  U.S. Const.
Amend. VI, XIV.

    C.  FAILURE OF APPELLATE COUNSEL TO BRING TO THE
ATTENTION OF APPELLATE COURT THE ISSUES OF
TEMPORARY AND FINAL RESTRAINING ORDERS APPLYING
RULING IN STATE V. CASTAGNA, 400 N.J. Super. 164 . . .
DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE
CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF
COUNSEL, TO DUE PROCESS, AND TO A FAIR TRIAL.  U.S. Const.
Amend. VI, XIV.

D.  FAILURE OF TRIAL, OR APPELLATE COUNSEL. TO BRING TO THE ATTENTION OF THE TRIAL OR THE APPELLATE COURT THAT THE TERRORISTIC THREATS CHARGE WAS BASED, BY THE STATE'S OWN ADMISSION, ON INCOMPLETE 911 CALL, DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL, TO DUE PROCESS, AND A FAIR TRIAL.  U.S. Const. Amend. VI, XIV.

E.  FAILURE OF APPELLATE COUNSEL TO BRING TO THE ATTENTION OF THE APPELLATE COURT THAT CONVICTION FOR AGGRAVATED ASSAULT SECOND DEGREE IS IN CONTRAVENTION OF N.J.S.A. 2C:12-1(b)1, DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL, TO DUE PROCESS, AND A FAIR TRIAL.  U.S. Const. Amend. VI, XIV.

F.  FAILURE OF TRIAL, OR APPELLATE COUNSEL TO OBJECT ON SIXTH AMENDMENT AND FED. R. EVID. 404(b) AND 703 GROUNDS TO INTRODUCTION AT TRIAL THROUGH TESTIMONY OF DR. UTKEWICZ STATEMENTS OF NON-TESTIFYING WITNESSES, WHERE STATE NEVER ASSERTED THE WITNESSES UNAVAILABILITY AND DEFENDANT HAS HAD NO PRIOR OPPORTUNITY TO CROSS-EXAMINE THE WITNESSES, DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL. TO DUE PROCESS, AND A FAIR TRIAL.  U.S. Const. Amend. VI, XIV, Fed. R. Evid. 404(b), 703.

G.  FAILURE OF THE APPELLATE COUNSEL TO BRING TO THE ATTENTION OF THE APPELLATE COURT THAT THE TRIAL COURT ALLOWED THE STATE TO ELICIT 404(b) EVIDENCE THROUGH TESTIMONY OF DR. WEINAPPLE, WHICH ALSO VIOLATED HIS SIXTH AMENDMENT RIGHTS TO CONFRONTATION AND DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL, TO DUE PROCESS, AND A FAIR TRIAL.  U.S. Const. Amend. VI, XIV, FED. R. EVID. 703

H.  FAILURE OF THE TRIAL, OR THE APPELLATE COUNSEL TO OBJECT TO STATE PROSECUTOR READING TO THE JURY FROM THE TRANSCRIPTS OF TESTIMONIAL STATEMENT OF DEFENDANT'S WIFE, HAVING ALL THE AUTHORITY OF THE

10

STATE BEHIND HIM AND MAKING HIMSELF AN UNSWORN
WITNESS, VIOLATED DEFENDANT'S SIXTH AMENDMENT
RIGHTS TO CONFRONTATION AND DEPRIVED DEFENDANT OF
HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE
EFFECTIVE ASSISTANCE OF COUNSEL, TO DUE PROCESS, AND
A FAIR TRIAL.  U.S. Const. Amend. VI. XIV.

Point V:  FAILURE OF TRIAL COUNSEL TO INVESTIGATE LEVEL OF
DEFENDANT'S INTOXICATION ON THE NIGHT HE ALLEGEDLY
ASSAULTED HIS WIFE, DEPRIVED DEFENDANT OF OBVIOUS, AND
SIGNIFICANT AVENUE OF DEFENSE AND DEPRIVED DEFENDANT OF
HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE
EFFECTIVE ASSISTAN[CE] OF COUNSEL, TO DUE PROCESS, AND A
FAIR TRIAL.  U.S. Const. Amend. VI, XIV.

Point VI:  FAILURE OF TRIAL COUNSEL TO PRESENT TO THE JURY AND
THE COURT THE FACT THAT DEFENDANT WAS, ON JANUARY 20,
2002, WAS CHARGED WITH AGGRAVATED ASSAULT ON SOUTH
BRUNSWICK POLICE OFFICER KENNETH DROST, BUT WAS NEVER
INDICTED FOR SUCH AN OFFENSE, DEPRIVED DEFENDANT OF
OBVIOUS VIABLE DEFENSE (INTOXICATION-PROSTRATION OF
FACULTIES - DEFENSE, WHICH NEGATES THE ELEMENT OF THE
OFFENSE, SUCH AS PURPOSELY OR KNOWINGLY) WITH REGARDS TO
ALLEGED ASSAULT ON HIS WIFE ON JANUARY 19, 2002 AND
TERRORISTIC THREATS AND CONTEMPT OF COURT ORDER ON
JANUARY 20, 2002, VIOLATED HIS FEDERAL AND STATE
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTAN[CE] OF
COUNSEL, TO DUE PROCESS, AND A FAIR TRIAL.  U.S. Const. Amend. VI,
XIV.

Point VII:  FAILURE OF TRIAL OR APPELLATE COUNSEL TO OBJECT TO
TESTIMONY OF MICHAEL GRUBER AND LINDA CRAIG, VIOLATED
DEFENDANT'S SACRED ATTORNEY/CLIENT PRIVILEGE AND
UTTERLY DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE
CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF
COUNSEL, TO DUE PROCESS, AND A FAIR TRIAL.  U.S. Const. Amend. v,
VI, XIV.

(Dkt. 24-5 at 2-6.)

The State opposed the motions, arguing that the motion to amend should be denied

because the new claims are barred by the statute of limitations and Petitioner did not show that

11

equitable tolling is warranted.  (Dkt. 25.)  In response, Petitioner argues that equitable tolling is warranted:

> [T]he petitioner is foreign born, naturalized U.S. citizen and is confused in understanding the equitable tolling doctrine under 28 U.S.C. § 2244(d)(1)(A), and AEDPA standard.
>
> In addition, two years ago, when petitioner filed his original petition for Habeas Relief, he did this following advice, apparently erroneous, of a "prominent jailhouse lawyer."
>
> But for this erroneous advice, the Petitioner would have file[d] his first P.C.R. petition in accordance with N.J. Rules of Court R. 3:22.  Post-Conviction Relief.
>
> Had the petitioner ha[d] advi[c]e of competent, trained attorney, he should not have made a mistake, and file[d] his first P.C.R. Petition in the State Court immediately after his Petition for Certification on Direct Appeal was denied by the Supreme Court of New Jersey.
>
>                      *                *                *
>
> The Petitioner pleads that, utterly erroneous advice of "jailhouse lawyer", the intricacies and complexities of Fed. R. Civ. P. and the record that clearly indicates that he is diligently pursuing his rights, his failure to correctly file Habeas Petition, be considered by this Court, is effected by extraordinary circumstances which warrants granting his motion to amend, stay and protect the Petition for Habeas Relief.

(Dkt. 26 at 2-3.)

Boretsky contends he is entitled to equitable tolling because extraordinary circumstances prevented him from including his ineffective assistance of counsel claims in his § 2254 Petition before the statute of limitations expired on February 15, 2010.  Specifically, he argues that, as a naturalized citizen, he is confused about the equitable tolling doctrine and the statute of limitations, and a prominent jailhouse lawyer advised him to file the § 2254 Petition that is

pending before this Court (and which does not include the ineffective assistance of counsel claims).

The statute of limitations under § 2244(d) is subject to equitable tolling.  See Holland v. Florida, 130 S. Ct. 2549, 2560 (2010); Urcinoli v. Cathel, 546 F. 3d 269, 272 (3d Cir. 2008); Merritt v. Blaine, 326 F.3d 157, 161 (3d Cir. 2003); Miller v. N.J. State Dep't of Corr., 145 F.3d 616, 617-18 (3d Cir. 1998).  "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements:  (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  Holland, 130 S. Ct. at 2562 (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)); see also Pabon v. Mahanoy, 654 F. 3d 385, 399 (3d Cir. 2011); LaCava v. Kyler, 398 F.3d 271, 275-276 (3d Cir. 2005).

First, Boretsky states that he is a naturalized citizen.  Presumably, his native language is not English.  The Third Circuit has held that "inability to read or understand English, combined with denial of access to translation or legal assistance, can constitute extraordinary circumstances that trigger equitable tolling."  Pabon, 654 F. 3d at 400.  But here, Boretsky does not contend that he is unable to read or understand English.  The fact that Boretsky is a naturalized citizen is not an extraordinary circumstance.

Second, Boretsky states that he failed to pursue state post-conviction relief before filing this § 2254 Petition because a prominent jailhouse lawyer mistakenly advised him to file his § 2254 petition first.  The Supreme Court has determined that "counsel's mistake in miscalculating the limitations period [does not] entitle [a petitioner] to equitable tolling.  If credited, this argument would essentially equitably toll limitations periods for every person whose attorney missed a deadline.  Attorney miscalculation is simply not sufficient to warrant equitable tolling,

particularly in the postconviction context where prisoners have no constitutional right to counsel." Lawrence v. Florida, 549 U.S. 327, 336-37 (2007).  If attorney negligence or miscalculation does not constitute an extraordinary circumstance warranting equitable tolling, then it follows that the negligence of a jailhouse lawyer cannot constitute an extraordinary circumstance.  To be sure, in Holland v. Florida, 130 S.Ct. 2549, 2563 (2010), the Supreme Court rejected the Eleventh Circuit's ruling that attorney conduct, even if grossly negligent, can never warrant tolling absent bad faith, dishonesty, divided loyalty, or mental impairment on the lawyer's part:

> Several lower courts have specifically held that unprofessional attorney conduct may, in certain circumstances, prove "egregious" and can be "extraordinary" even though the conduct in question may not satisfy the Eleventh Circuit's rule.  See Nara v. Frank, 264 F.3d 310, 320 (3d Cir. 2001) (ordering hearing as to whether client who was "effectively abandoned" by lawyer merited tolling); Calderon, 128 F.3d, at 1289 (allowing tolling where client was prejudiced by a last minute change in representation that was beyond his control); Baldayaque, 338 F.3d, at 152-53 (finding that where an attorney failed to perform an essential service, to communicate with the client, and to do basic legal research, tolling could, under the circumstances, be warranted); Spitsyn, 345 F.3d, at 800-802 (finding that "extraordinary circumstances" may warrant tolling where lawyer denied client access to files, failed to prepare a petition, and did not respond to his client's communications); United States v. Martin, 408 F.3d 1089, 1096 (C.A.8 2005) (client entitled to equitable tolling where his attorney retained files, made misleading statements, and engaged in similar conduct).

> We have previously held that "a garden variety claim of excusable neglect," Irwin, 498 U.S., at 96 . . , such as a simple "miscalculation" that leads a lawyer to miss a filing deadline, does not warrant equitable tolling.  But the case before us does not involve, and we are not considering, a "garden variety claim" of attorney negligence.  Rather, the facts of this case present far more serious instances of attorney misconduct.  And, as we have said, although the circumstances of a case must be "extraordinary" before equitable tolling can be applied, we hold that such circumstances are not limited to those that satisfy the test that the Court of Appeals used in this case.

> The record facts . . . suggest that this case may well be an "extraordinary" instance in which petitioner's attorney's conduct constituted far more than "garden variety" or "excusable neglect."  To be sure, Collins failed to file Holland's petition on time and appears to have been unaware of the date on which the limitations period expired - two facts that, alone, might suggest simple negligence.  But, in these circumstances, the record facts . . . suggest that the failure amounted to more: Here, Collins failed to file Holland's federal petition on time despite Holland's many letters that repeatedly emphasized the importance of his doing so. Collins apparently did not do the research necessary to find out the proper filing date, despite Holland's letters that went so far as to identify the applicable legal rules. Collins failed to inform Holland in a timely manner about the crucial fact that the Florida Supreme Court had decided his case, again despite Holland's many pleas for that information.  And Collins failed to communicate with his client over a period of years, despite various pleas from Holland that Collins respond to his letters.

Holland, 130 S.Ct. at 2563-64 (citations omitted).

In this case, Boretsky's claimed ignorance of the AEDPA and reliance on the mistaken legal advice of a jailhouse lawyer is belied by the record.  To prevent the very ignorance claimed by Boretsky, the Third Circuit requires district courts to inform § 2254 petitioners of the procedural and other limitations imposed by the AEDPA.  See Mason v. Myers, 208 F.3d 414 (3d Cir. 2000).  Accordingly, by Order entered on February 25, 2009 - two days after the docketing of Boretsky's § 2254 Petition and almost one year before the statute of limitations expired - this Court informed Boretsky that his § 2254 petition must include all available federal claims because the AEDPA bars second or successive petitions, that federal claims must be exhausted in the state courts, and that this all-inclusive § 2254 petition must be filed within one year of the date his conviction becomes final upon the conclusion of direct review or the expiration of the time for seeking such review.  (Dkt. 2.)  The Mason Order cited the relevant federal statutes and asked Boretsky if he wanted this Court to rule on the Petition "as is" or if he wanted to withdraw the pending Petition in order to add additional claims, subject to the one-year

statute of limitations.  Id.  Boretsky notified this Court that he wanted the Court to consider his all-inclusive petition "as is."  (Dkt. 4.)

Boretsky had actual notice of the limitations (time, successive petition bar, and exhaustion requirement) imposed by the AEDPA.  Accordingly, he cannot show that some extraordinary circumstance stood in his way and prevented him from presenting his ineffective assistance of counsel claims  - to the New Jersey court in a petition for post-conviction relief or to this Court in a timely motion to amend the Petition - before the statute of limitations expired on February 15, 2010.  This Court will deny the motion to amend the Petition to add the new claims and will deny the motion to stay the Petition pending the outcome of Boretsky's state petition for post-conviction relief.  See Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990) ([T]he principles of equitable tolling . . . do not extend to what is at best a garden variety claim of excusable neglect"); Hall v. Warden, Lebanon Correctional Inst., 662 F.3d 745, 751 (6th Cir. 2011) (pro se status and lack of knowledge of law are not sufficient to constitute extraordinary circumstances and excuse late filing); Griffith v. Rednour, 614 F.3d 328, 331 (7th Cir. 2010) ("Holland tells us that a simple legal mistake does not excuse an untimely filing"); see also Drew v. MacEachern, 620 F.3d 16, 24 (1st Cir. 2010); Webster v. Ricci, 2012 WL 295671 (D.N.J. Jan. 30, 2012); Skelton v. Ricci, 2011 WL 1402687 (D.N.J. Apr. 13, 2011).[6]

This Court also finds that Boretsky has not shown that he exercised reasonable diligence in bringing his claims.  See Holland, 130 S. Ct. at 2562.  "The obligation to act diligently

---

[6]  Cf. Delaney v. Matesanz, 264 F.3d 7, 15 (1st Cir. 2001) ("While judges are generally lenient with pro se litigants, the Constitution does not require courts to undertake heroic measures to save pro se litigants from the readily foreseeable consequences of their own inaction").

pertains to both the federal habeas claim and the period in which the petitioner exhausts state court remedies, and the court may consider the time of filing the habeas petition as a factor in determining reasonable diligence." Alicia v. Karestes, 389 Fed. App'x 118, 122 (3d Cir. 2010)' LaCava v. Kyler, 398 F.3d 271, 277 (3d Cir. 2005).  This Court finds that Boretsky was not diligent in seeking to amend his § 2254 Petition to include the ineffective assistance claims, given that this Court issued the Mason order almost a year before the statute of limitations expired.

The equitable tolling doctrine extends the AEDPA's statutory deadline in extraordinary circumstances for petitioners who were prevented from complying through no fault or absence of diligence.  Equitable tolling is not warranted here because Boretsky has not offered any basis for finding that he has been prevented by an extraordinary circumstance from asserting his ineffective assistance claims, nor has he shown he has been diligent in pursuing those claims. And because Boretsky has not made good faith allegations that would, if true, entitle him to equitable tolling, he is not entitled to an evidentiary hearing on his equitable tolling argument. See Roy v. Lampert, 465 F.3d 964, 969 (9th Cir. 2006).

### III.  STANDARD OF REVIEW

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition as follows:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

17

"As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011). Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The AEDPA further limits a federal court's authority to grant habeas relief when a state court has adjudicated petitioner's federal claim on the merits. See 28 U.S.C. § 2254(d). If a claim has been adjudicated on the merits in state court proceedings, § 2254(d) limits habeas relief as follows:

> (d) An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A court must look for "the governing legal principle or principles set forth by the

Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams, 529 U.S. at 405-06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. However, under § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Harrington, 131 S. Ct. at 785 (quoting Williams at 410).[7] As the Supreme Court explained,

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision . . . . Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

Harrington, 131 S. Ct. at 786 (citations and internal quotation marks omitted).

---

[7] See also Wright v. Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law") (citation and internal quotation marks omitted).

"This is a difficult to meet, and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen, 131 S. Ct. at 1398 (citations and internal quotation marks omitted). The petitioner carries the burden of proof, and review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Id.

## IV. DISCUSSION

A. Admission of Petitioner's Out of Court Statements

In Ground One, Petitioner argues that his Fifth and Sixth Amendment rights were violated by the admission of his statements made to police on March 3 and 4, 2002. Petitioner argues that the New Jersey Supreme Court "MISAPPLIED THE UNITED STATES SUPREME COURT'S RULING IN EDWARDS V. ARIZONA BY ADMITTING THE DEFENDANT'S STATEMENT TAKEN BY POLICE DURING THE CUSTODIAL INTERROGATION BY MISAPPLYING THE DOCTRINE OF PUBLIC SAFETY AND RESCUE AS AN EXCEPTION TO MIRANDA WARNING. THIS ERROR TRIGGERED VIOLATION OF THE V, VI, AND KEEPING THE PETITIONER INCOMMUNICADO, VIOLATION OF THE XIV AMENDMENT TO THE U.S. CONSTITUTION." (Dkt. 14, p. 2.) Relying on New York v. Quarles, 467 U.S. 649 (1984), the government argues that Boretsky's statements were admissible under the public safety exception to Miranda.

Boretsky presented this ground to the New Jersey Supreme Court when that court granted the state leave to appeal to review the Law Division's pretrial order suppressing three statements Boretsky made to police who responded to his 9-1-1 telephone call "in which [he] reported that

Moukhametova[, Boretsky's wife,] had attempted suicide."  State v. Boretsky, 186 N.J. 271, 273

(2006).  The New Jersey Supreme Court recounted the facts as follows:

> Shortly before midnight on March 3, 2002, Officer John Penney of the South
> Brunswick Township Police Department was dispatched to Moukhametova's
> residence. He was responding to a 9–1–1 telephone call in which the caller
> reported that Moukhametova had attempted suicide. The 9–1–1 call was placed
> from Moukhametova's home by defendant, her estranged husband. The couple
> was known to the South Brunswick police. Approximately six weeks earlier,
> South Brunswick officers had responded to a domestic violence incident at the
> home. As a result of that incident, Moukhametova obtained a temporary
> restraining order (TRO), and later a final restraining order (FRO), against
> defendant before the events of March 3. The 9–1–1 dispatcher informed Officer
> Penney about the FRO when sending him on the assignment.
>
> Upon arriving at Moukhametova's home, Penney observed defendant pacing by
> the living room window talking on a portable phone. Before seeking entry, Penney
> confirmed that the 9–1–1 dispatcher was not on the line with defendant. After
> Penney knocked on the door, defendant answered with the telephone in hand.
> Defendant attempted to hand the instrument to Penney, saying "can you speak to
> my attorney?" Penney responded that he was there for a first-aid call and asked
> where defendant's wife was. Defendant allowed Penney into the house and
> directed him to the living room where Penney observed Moukhametova's
> motionless body lying on a couch. It was obvious that she had a chest injury. On a
> coffee table nearby lay a kitchen knife with blood on it. Penney called for first aid
> assistance and then asked defendant when he had heard last from his wife.
> Defendant's response—that he had seen her or talked to her around 4:00 p.m.—is
> the first statement that the motion court suppressed. Defendant again tried to hand
> the portable telephone to Penney, repeating "can you please talk to my attorney?"
> Penney did not take the phone. Instead he attended to Moukhametova and told
> defendant to stop moving around.
>
> Defendant was standing and watching Penney when Officer Reeves and then
> Officer LaPoint entered the living room. At Reeves' direction, defendant sat down
> on the living room floor. As the officers continued to attend to Moukhametova,
> defendant persisted in holding and waving the telephone, saying "talk to my
> lawyer" or "my lawyer is on the phone." The officers ignored defendant's
> disruptions until, at some point, they took the phone and threw it onto a sofa
> beyond defendant's reach; the bloodied knife, however, remained unsecured on the
> table nearby. Officer LaPoint drew his gun, pointed it at defendant, and ordered
> him to lie face down on the floor. Defendant was placed under arrest for violating
> the FRO and was administered *Miranda* warnings. While defendant was being led

21

outside to a waiting patrol car, he asked how his wife was doing. The officer responded that he did not know. The officer then asked defendant "how long did you wait to call the police?" Defendant's response—that he waited forty-five minutes to call 9–1–1 after his wife was stabbed—is the second statement suppressed by the motion court.

Additional officers arrived at Moukhametova's home that evening. One officer approached defendant as he was being placed into the patrol car and observed apparent blood stains on defendant's clothing. The officer directed that defendant's clothes be secured in bags. Hearing that, defendant blurted out "I tried to help." A short time later, while defendant was in the back of the patrol car, he asked one of the officers whether his wife was "okay." The officer did not respond.

While being processed at police headquarters, defendant repeatedly asked about his wife's condition. The processing officer responded that he did not know. Defendant began to complain of chest pains and, while he clutched his chest, blurted out "I'm sorry." Defendant was taken by ambulance to a hospital where he was treated for his complaints. After defendant received medical attention, several detectives decided to question him. Defendant was advised again of his *Miranda* rights and acknowledged his understanding of those rights. He agreed to questioning, during which he again repeatedly asked about his wife's condition. Defendant's statement made in response to police questioning at the hospital the morning of March 4, 2002 was suppressed later by the motion court.

In May of 2002, defendant was indicted and charged with the murder of Moukhametova, in violation of *N.J.S.A.* 2C:11–3(a)(1), (2). He also was charged with aggravated assault, *N.J.S.A.* 2C:12–1(b); terroristic threats, *N.J.S.A.* 2C:12–3(a); contempt, *N.J.S.A.* 2C:29–9(b); burglary, *N.J.S.A.* 2C:18–2; possession of a weapon with the purpose to use it unlawfully, *N.J.S.A.* 2C:39–4(d); and tampering with evidence, *N.J.S.A.* 2C:28–6(1).

Defendant moved to suppress all statements that he made to the police on March 3 and 4, 2002. The motion court found that defendant invoked his right to counsel by repeatedly asking the responding officers to speak to his attorney on the telephone. The court also found that defendant was effectively in custody during that period. Accordingly, the court suppressed the statements defendant made in response to police questioning, but not those that he made spontaneously. As a result, defendant's repeated questions about how his wife was doing were not suppressed. Nor did the court suppress defendant's statement "I'm sorry," made at the police station, or his statement "I tried to help," made outside the house as he was being placed into the patrol car.

Boretsky, 186 N.J. at 273-276 (footnotes omitted).

After conducting a suppression hearing[8], the Law Division suppressed the three statements described above, the Appellate Division affirmed, and the state sought and obtained review by the New Jersey Supreme Court.  Relying on New York v. Quarles, 467 U.S. 649 (1984), the New Jersey Supreme Court reversed the order of suppression in accordance with the public safety exception to the suppression remedy imposed by Miranda v. Arizona, 384 U.S. 436 (1966):

> The uncontroverted testimony at the suppression hearing was that the police were sent to Moukhametova's home in response to a 9-1-1 emergency call placed by defendant seeking assistance for his estranged wife.
>
> *                    *                    *
>
> The record indisputably indicates that the provision of emergency assistance to an alleged suicide victim was the officers' paramount goal upon arriving at the residence and their actions bespeak a consistent effort to assist a victim obviously requiring first aid. Consistent therewith was Penney's initial verbal interaction with defendant. Penney asked where defendant's wife was and, a short while later, asked when defendant had last spoken with the unresponsive victim lying on the couch. The exchanges were incident to the officer's management of the emergency and were part of an objectively reasonable course of action taken by Penney in the face of that emergency.
>
> *                    *                    *
>
> Here also, the emergency-response activity unfolding in Moukhametova's home bore no resemblance to a coercive custodial interrogation of the sort that concerned the common law and later led to the constitutional right against self-incrimination and, ultimately, the Miranda remedy. The police purpose in coming to the scene was to provide emergency aid. The officers were the community's first responders and were required to give the victim their primary attention. When

---

[8] At the suppression hearing, police officer John Penney testified that he was the first officer on the scene and he was "[d]ispatched to respond to a first aid call for an attempted suicide" at 11:37 p.m. on Sunday, March 3, 2002.  State v. Boretsky, Ind. No. 02-05-0642-I transcript at 6 (N.J. Super. Ct., Law Div., July 20, 2004).  He further testified that the [d]ispatcher informed me that the attempted suicide was involving a knife and that the person on the premise calling was in violation of a TRO or an FRO."  Id. at 7.

acting in furtherance of that duty the police officers must be able to assess the needs of the victim, including asking defendant about his last interaction with his unresponsive wife. Simply put, the duty to provide aid is paramount.

         \*         \*         \*

In sum, the police officers' emergency aid response trumps application of Miranda and its protection of defendant's privilege against self-incrimination. In light of that conclusion, it is not necessary for us to resolve what the officers reasonably could or should have made of this defendant's wild waving of a telephone in their direction while he repeated the question "can you talk to my lawyer?" We recognize the ambiguity in defendant's repeated question and that both the trial court and Appellate Division viewed the matter through the prism of that ambiguity. We are not sure whether those courts treated defendant's statements as an exercise of the right to counsel or an ambiguous assertion of a desire for counsel's participation. In either case, the meaning of defendant's repeated questions does not alter the analysis. Because we conclude that the emergency aid doctrine overrides the need to give Miranda warnings, the protections of Miranda simply are not triggered.

We find that the police officers sought information from defendant in carrying out their emergency aid functions and that in that setting, he cannot claim a violation of his right against self-incrimination. See New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Extension of the Miranda rule in this case is not "justified by its necessity for the protection of the actual right against compelled self-incrimination." United States v. Patane, 542 U.S. 630, 639, 124 S.Ct. 2620, 2627, 159 L.Ed.2d 667, 676 (2004) (citing Chavez v. Martinez, 538 U.S. 760, 778, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003)).

         \*         \*         \*

When later defendant was placed under arrest, he was given Miranda warnings.  If defendant's earlier request for the police to speak to his attorney on the telephone was intended to be an exercise of the right to counsel, the Miranda warnings should have alerted him to say he was represented by counsel.  Defendant did not so indicate.  It was therefore permissible, after he initiated conversation by asking about his wife's condition, for the officer to ask defendant how long he had waited before calling 9-1-1 . . . .  We reject the proposition than an individual's equivocal statement about "counsel," made during an emergency aid situation while in police presence and before Miranda warnings are administered, constitutes the invocation of the Miranda right to counsel.  Just as the anticipatory invocation of that right to counsel is ineffective outside of the custodial

interrogation setting, <u>McNeil v. Wisoncsin</u>, 501 U.S. 171, 182 n.3 . . . . (1991), an ambiguous invocation of that right is ineffective in an emergency aid setting.

For defendant Boretsky, during the emergency aid assistance period his ambiguous repeated request of the responding officers to talk to his attorney did not trigger <u>Miranda's</u> protections.  When the officers' attention turned to defendant and he was placed under arrest, he properly was given <u>Miranda</u> warnings.  He did not assert thereafter his right to counsel.  Thus, his decision to initiate conversation left him open to a follow-up question, and later at the hospital he agreed to questioning after being given, again, <u>Miranda</u> warnings.  Those statements should not have been suppressed.

<u>Boretsky</u>, 186 N.J. at 279-84.

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination.  See <u>Malloy v. Hogan</u>, 378 U.S. 1, 8 (1964).  In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Court held that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. at 467.  When police ask questions of a suspect in custody without administering the required warnings, <u>Miranda</u> dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief.  See <u>Oregon v. Elstad</u>, 470 U.S. 298, 317 (1985).  Thus, a confession taken during a custodial interrogation without the provision of <u>Miranda</u> warnings violates the privilege against self incrimination.  See <u>Thompson v. Keohane</u>, 516 U.S. 99 (1995).

"To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the <u>Miranda</u> Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court,

25

and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation."  Thompson, 516 U.S. at 107; see also Miranda, 384 U.S. at 479.  The Miranda Court outlined the procedures to be followed after the police provide these warnings.  If the accused requests counsel, then "the interrogation must cease until an attorney is present." Miranda, 384 U.S. at 474.

In Quarles, the defendant - Quarles - was charged with criminal possession of a weapon. The facts were as follows:

> Officer Frank Kraft and Officer Sal Scarring were on road patrol in Queens, N.Y., when a young woman approached their car. She told them that she had just been raped by a black male, approximately six feet tall, who was wearing a black jacket with the name "Big Ben" printed in yellow letters on the back. She told the officers that the man had just entered an A & P supermarket located nearby and that the man was carrying a gun.
>
> The officers drove the woman to the supermarket, and Officer Kraft entered the store while Officer Scarring radioed for assistance. Officer Kraft quickly spotted respondent, who matched the description given by the woman, approaching a checkout counter. Apparently upon seeing the officer, respondent turned and ran toward the rear of the store, and Officer Kraft pursued him with a drawn gun. When respondent turned the corner at the end of an aisle, Officer Kraft lost sight of him for several seconds, and upon regaining sight of respondent, ordered him to stop and put his hands over his head.
>
> Although more than three other officers had arrived on the scene by that time, Officer Kraft was the first to reach respondent. He frisked him and discovered that he was wearing a shoulder holster which was then empty. After handcuffing him, Officer Kraft asked him where the gun was. Respondent nodded in the direction of some empty cartons and responded, "the gun is over there." Officer Kraft thereafter retrieved a loaded .38-caliber revolver from one of the cartons, formally placed respondent under arrest, and read him his Miranda rights from a printed card. Respondent indicated that he would be willing to answer questions without an attorney

26

present. Officer Kraft then asked respondent if he owned the gun and where he had purchased it. Respondent answered that he did own it and that he had purchased it in Miami, Fla.

In the subsequent prosecution of respondent for criminal possession of a weapon, the judge excluded the statement, "the gun is over there," and the gun because the officer had not given respondent the warnings required by our decision in Miranda v. Arizona . . . , before asking him where the gun was located. The judge excluded the other statements about respondent's ownership of the gun and the place of purchase, as evidence tainted by the prior Miranda violation. The Appellate Division of the Supreme Court of New York affirmed without opinion.

Quarles, 467 U.S. at 651-53 (footnotes omitted).

Although Quarles "was surrounded by at least four police officers and was handcuffed when the questioning at issue took place," 467 U.S. at 655, the Supreme Court reversed the decision of the New York courts.  The Court explained:

The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

In such a situation, if the police are required to recite the familiar Miranda warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in Miranda in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the Miranda majority was willing to bear that cost. Here, had Miranda warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence

27

> useful in convicting Quarles. Officer Kraft needed an answer to his
> question not simply to make his case against Quarles but to insure
> that further danger to the public did not result from the
> concealment of the gun in a public area.
>
> We conclude that the need for answers to questions in a situation
> posing a threat to the public safety outweighs the need for the
> prophylactic rule protecting the Fifth Amendment's privilege
> against self-incrimination. We decline to place officers such as
> Officer Kraft in the untenable position of having to consider, often
> in a matter of seconds, whether it best serves society for them to
> ask the necessary questions without the <u>Miranda</u> warnings and
> render whatever probative evidence they uncover inadmissible, or
> for them to give the warnings in order to preserve the admissibility
> of evidence they might uncover but possibly damage or destroy
> their ability to obtain that evidence and neutralize the volatile
> situation confronting them.

<u>Quarles</u> 467 U.S. at 657-58 (footnote omitted).

The Court held that a person's statements, albeit not preceded by <u>Miranda</u> warnings, are

admissible if the totality of the circumstances shows the officer's questions "relate to an

objectively reasonable need to protect the police or the public from any immediate danger."

<u>Quarles</u>, 467 U.S. at 659 n.8.  <u>See also</u> <u>United States v. Duncan</u>, 2009 WL 215353 at *8 (3d Cir.

Jan. 30, 2009) (<u>Quarles</u>' central holding [is] that the <u>Miranda</u> warnings are not required in the

face of an objectively reasonable need to protect the police or the public from any immediate

danger associated with a weapon") (Chagares, J., concurring).

Supreme Court holdings after <u>Quarles</u> have not eroded the public safety exception to un-

Mirandized statements.  In <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), the police went to the home of

Elstad, an 18-year old, to arrest him for burglary pursuant to a warrant.  While one police officer

was explaining to Elstad's mother why the police were there, the other officer asked Elstad if

Elstad knew a person by the name of Gross, and Elstad said yes, and added that he heard that

there was a robbery at Gross's house.  When the officer told Elstad that the officer felt that Elstad was involved in the robbery, Elstad stated, "Yes, I was there."  Id. at 301.  The police took Elstad to the police headquarters, advised Elstad for the first time of his Miranda rights by reading him the card, and Elstad stated he understood his rights and wanted to speak to the officers.  Id. Elstad then gave a full confession, explaining that he had known that the Gross family was out of town and he had been paid to lead several acquaintances to the Gross house and show them how to gain entry through a defective sliding glass door.  Id.  The statement was typed, reviewed by Elstad, and signed by Elstad.  The trial court suppressed the first statement but admitted the confession, and the Oregon appellate court suppressed both statements.

After the Oregon Supreme Court declined review, the Supreme Court granted certiorari to consider the question whether the Fifth Amendment requires the suppression of a confession, made after proper Miranda warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant.  Id. at 303.  The Supreme Court reversed the order of suppression.  First, the Court noted that the Oregon court misconstrued the protections afforded by Miranda warnings when it assumed that "a failure to administer Miranda warnings necessarily breeds the same consequences as police infringement of a constitutional right, so that evidence uncovered following an unwarned statement must be suppressed as 'fruit of the poisonous tree.'"  Id. at 304.  The Court explained that, where a Fourth Amendment violation taints the confession, the prosecution must show that a subsequent confession was both voluntary and that "a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation . . . .  The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony.  Consequently,

29

unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment

must nevertheless be excluded from evidence under Miranda.  Thus, in the individual case,

Miranda's preventive medicine provides a remedy even to the defendant who has suffered no

identifiable constitutional harm . . . .  Despite the fact that patently *voluntary* statements taken in

violation of Miranda must be excluded from the prosecution's case, the presumption of coercion

does not bar their use for impeachment purposes on cross-examination."  Id. at 307.  When the

"alleged 'fruit' of a noncoercive Miranda violation is neither a witness nor an article of evidence

but the accused's own voluntary testimony . . . , the absence of any coercion or improper tactics

undercuts the twin rationales - trustworthiness and deterrence - for a broader rule.  Once warned,

the suspect is free to exercise his own volition in deciding whether or not to make a statement to

the authorities."  Id. at 308.  Noting that "[t]here is a vast difference between the direct

consequences flowing from coercion of a confession by physical violence or other deliberate

means calculated to break the suspect's will and the uncertain consequences of disclosure of a

'guilty secret' freely given in response to an unwarned but noncoercive question, as in this case,"

id. at 312, the Court ruled that

> it is an unwarranted extension of Miranda to hold that a simple failure to
> administer the warnings, unaccompanied by any actual coercion or other
> circumstances calculated to undermine the suspect's ability to exercise his free
> will, so taints the investigatory process that a subsequent voluntary and informed
> waiver is ineffective for some indeterminate period.  Though Miranda requires
> that the unwarned admission must be suppressed, the admissibility of any
> subsequent statement should turn in these circumstances solely on whether it is
> knowingly and voluntarily made.

Id. at 309.

"We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite <u>Miranda</u> warnings."  <u>Elstad</u>, 470 U.S. at 318.

In 1987, the Supreme Court ruled in <u>Connecticut v. Barrett</u>, 479 U.S. 523 (1987), that the police may continue to interrogate a suspect who has made only a limited request for counsel, provided the suspect is willing to continue to talk to police without counsel.  In that case, Barrett told the officers during a custodial interrogation that he "was willing to talk about [the incident] verbally but he did not want to put anything in writing until his attorney came,"  <u>Barrett</u>, 479 U.S. at 526.  The Supreme Court held that the admission of Barrett's subsequent verbal confession did not violate the Fifth Amendment or <u>Miranda</u> because the confession was not in writing.  As the Supreme Court explained:

> It is undisputed that Barrett desired the presence of counsel before making a written statement.  Had the police obtained such a statement without meeting the waiver standards of *Edwards*, it would clearly be inadmissible.  Barrett's limited requests for counsel, however, were accompanied by affirmative announcements of his willingness to speak with the authorities.  The fact that officials took the opportunity provided by Barrett to obtain an oral confession is quite consistent with the Fifth Amendment.  *Miranda* gives the defendant a right to choose between speech and silence, and Barrett chose to speak . . . .  Here . . . Barrett made clear his intentions, and they were honored by police.  To conclude that respondent invoked his right to counsel for all purposes requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of respondent's statement . . . .  We also reject the contention that the distinction drawn by Barrett between oral and written statements indicates an understanding of the consequences so incomplete that we should deem his limited invocation of the right to counsel effective for all purposes.

<u>Barrett</u>, 479 U.S. at 529-30 (footnotes omitted).

In this case, it was Boretsky himself who created the belief of Penney and the other immediately responding officers that Lana's life was in the balance, i.e., Boretsky called 9-1-1 seeking police assistance for Lana's attempted suicide. When Penney arrived, he was responding to an attempted suicide. He was confronted with the immediate necessity of ascertaining whether Lana's life could be saved. Under these circumstances, it was objectively reasonable for Penney to ask Boretsky when he had last heard from Lana. This was not a question designed to incriminate Boretsky or to elicit an incriminating answer, but to determine Lana's condition and life-saving needs until medical personnel arrived.

Later, in state court, Boretsky argued that the police responding to his own 9-1-1 call reporting an attempted suicide should have immediately suspected that Boretsky had murdered his wife and provided Miranda warnings before asking Boretsky when Lana had last spoken. This is objectively unreasonable, particularly where Boretsky himself created the public safety danger by seeking emergency first-aid for Lana's attempted suicide. "Miranda was designed to guard against [] the danger of coercion [that] results from the *interaction* of custody and official interrogation." Howes v. Fields, ___ S.Ct. ___, 2012 WL 538280 5 (Feb. 22, 2012) (citation and internal quotation marks omitted) (emphasis in original). "Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." Id. at *11 (quoting Berkemefr v. McCarty, 468 U.S. 420, 437 (1984)).

On the facts of this case, due to the reasonable and immediate concern of determining if Lana's life could be saved, the concerns that powered Miranda were not implicated. The New Jersey Supreme Court's determination that Officer Penney's question was prompted by an

objectively reasonable concern for Lana's life and to find out whether time was of the essence in administering life-saving techniques, was not contrary to, or an unreasonable application of Quarles' public safety exception or its progeny.  See United States v. Judge, 2011 WL 4793199 *4 (3d Cir. 2011) (District Court's determination that defendant's in-field statement in response to officer's question as to whether sweatshirt and baseball cap were his fell within public safety exception where eyewitness had seen person in sweatshirt and baseball cap flee scene of shooting).

Boretsky nevertheless argues that Edwards v. Arizona, 451 U.S. 477 (1981), clearly established that admission of his non-Mirandized statements violated his right against self-incrimination.  In that case, while in custody and after being given the Miranda warnings, Edwards said, "I want an attorney before making a deal."  Id. at 479.  The interrogation ceased and Edwards was returned to jail, but at 9:15 the next morning police returned to the jail, again read Edwards his Miranda rights, and then questioned him without counsel, obtaining incriminating statements.  The Supreme Court determined:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his [Miranda] rights . . . .  [He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

Edwards, 451 U.S. at 484-85.

"The Edwards presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of prolonged police custody, by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into

33

submission."  Maryland v. Shatzer, 130 U.S. 1213, 1220 (2010) (citation and internal quotation

marks omitted).  In Shatzer, the Supreme Court described the three cases in which the Court has

held the Edwards rule applicable, i.e., Edwards, Arizona v. Roberson, 486 U.S. 675,  (1988), and

Minnick v. Mississippi, 498 U.S. 146 (1990):

> Edwards was arrested pursuant to a warrant and taken to a police station, where he
> was interrogated until he requested counsel.  The officer ended the interrogation
> and took him to the county jail, but at 9:15 the next morning, two of the officer's
> colleagues reinterrogated Edwards at the jail.  Roberson was arrested at the scene
> of a just-completed burglary and interrogated there until he requested a lawyer.  A
> different officer interrogated him three days later while he was still in custody
> pursuant to the arrest.  Minnick was arrested by local police and taken to the San
> Diego jail, where two FBI agents interrogated him the next morning until he
> requested counsel.  Two days later a Mississippi Deputy Sheriff reinterrogated
> him at the jail.

Shatzer, 130 S.Ct. at 1221 (citations, internal quotation marks and footnotes omitted).

In Davis v. United States, 512 U.S. 452 (1994), the Supreme Court ruled that Edwards

does not apply unless a suspect has made an unambiguous request not to talk outside the

presence of counsel.  After being given Miranda warnings and during interrogation, Davis said,

"Maybe I should talk to a lawyer."  Davis 512 U.S. at 455.  Noting that "a statement either is

such an assertion of the right to counsel or it is not," the Court determined that to unambiguously

request counsel, a suspect "must articulate his desire to have counsel present sufficiently clearly

that a reasonable police officer in the circumstances would understand the statement to be a

request for an attorney.  If the statement fails to meet the requisite level of clarity, Edwards does

not require that the officers stop questioning the suspect."  Id. at 459 (citations and internal

quotation marks omitted).  "[W]hen the officers conducting the questioning reasonably do not

know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of

34

questioning would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity." Id. at 459-60 (citation and internal quotation marks omitted). The Davis Court held that, after providing the Miranda warnings, "law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Id. at 461. The Court expressly "decline[d] to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461-62.[9]

Here, Edwards does not clearly establish that Boretsky's statements violated his right against self incrimination since Boretsky did not unequivocally request counsel.[10] As the Supreme Court recently explained, "the Edwards prophylactic rule . . . limits the ability of the police to initiate further questioning of a suspect in Miranda custody once the suspect [unequivocally] invokes the right to counsel." Howes v. Fields, ___ S.Ct. ___, 2012 WL 538280 *8 (Feb. 22. 2012). Boretsky cites no other Supreme Court precedent clearly establishing that the admission of his statements violated Miranda. This Court finds that the New Jersey Supreme Court's rejection of Boretsky's Miranda claim is not contrary to, or an unreasonable application

---

[9] See also Berghuis v. Thompkins, 130 S.Ct. 2250, 2259-60 (2010) ("In the context of invoking the Miranda right to counsel . . , a suspect must do so 'unambiguously.' If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her Miranda rights") (citing Davis, 512 U.S. at 461-62).

[10] After receiving the Miranda warnings and waiving his rights, at the hospital, Boretsky told the police that, during the day, Lana had asked him in a telephone call to come over to the house after 9 p.m., which he did. When she got home, she parked her car in the garage and Boretsky followed her into the house. When she saw him, she said she was either going to kill herself or kill him; she was holding a knife and she stabbed herself. She asked him to call the paramedics and he took her sweater off and blacked out when he saw the blood. (Dkt. 9-3 at 363.)

of Supreme Court precedent, and Petitioner is therefore not entitled to habeas relief on Ground One.

B.  Due Process - Instructions

In Grounds Two, Six, Eight and Fourteen, Boretsky challenges jury instructions on due process grounds.  He claims:  the instruction "that jury could consider evidence that defendant previously assaulted and threatened his wife as proof that he was guilty of murder deprived defendant of his right to a fair trial" (Ground Two); the trial court "failed to tailor the charges [on burglary and felony murder] to the facts of the case and failed to inform the jury that violation of a domestic violence restraining order does not satisfy the requirements of a 'purpose to commit an offense therein'" (Ground Six); the instruction failed to limit the jury's consideration to attempt to cause serious or significant bodily injury, rather than causing serious or significant bodily injury (Ground Eight); and the instruction during jury summation as to how to weigh the evidence relieved the prosecutor of proving the case beyond a reasonable doubt (Ground Fourteen).  Boretsky raised each of these grounds on direct appeal.  The government argues that these grounds involve state law and do not implicate the Constitution and, to the extent that they raise constitutional claims, the challenged instructions did not deprive Petitioner of due process.

(1) Instruction Allowing Consideration of Prior Assault and Threats

In Ground Two, Boretsky argues that the instruction allowing the jury to consider evidence of the assault on January 19, 2002, and threats on January 20, 2002, to determine Boretsky's motive or intent as to the alleged murder on March 3, 2002, violated due process because evidence of other crimes or bad acts may not be introduced to show that the defendant has a propensity or disposition toward criminal behavior.  Specifically, the judge instructed:

[B]efore you can give any weight to the evidence as to January 19th, January 20th, you must be satisfied that the defendant committed the aggravated assault or the terroristic threat. If you're not so satisfied you may not consider it for any other purpose. However, our rules do permit evidence of other crimes, wrongs or acts when the evidence is used for a certain specific narrow purpose that would be in this case the prosecutor wants to use that to prove intent or motive on the part of Mr. Boretsky as to the alleged murder on March 3rd, 2002.

Whether this evidence does in fact demonstrate intent or motive on Mr. Boretsky's part is for you to decide. You may decide that the evidence does not demonstrate any motive or any intent and is not helpful to you at all. In that case you must disregard the evidence for the purpose of the March 3rd alleged murder. On the other hand, you may decide that the evidence does demonstrate intent or motive and use it for that specific purpose only. However, you may not use this evidence to decide that the defendant has a tendency to commit crimes or that he is a bad person, that is, you may not decide that just because the defendant may have committed another crime, wrong or act that he therefore must be guilty of the present crime.

State v. Boretsky, Ind. No. 02-05-00642 transcript at 42-43 (N.J. Super. Ct., Law Div., Jan. 6, 2006).

On direct appeal, the Appellate Division rejected Boretsky's claim as follows:

No error, let alone plain error, appears in the trial court's instruction to the jury that motive or intent could be inferred from evidence of the January 19, 2002, assault, which led to the issuance of the TRO, and a threat the following day, which formed the basis for the terroristic threats charge. The trial judge's instruction to the jury, finely tailored to suit the circumstances presented, was comprehensive and correct in every significant detail . . . . The instruction fully clarified for the jury the narrow distinction between the permissible and impermissible uses of other-crime evidence.

State v. Boretsky, 2008 WL 4057972 at *4 (N.J. Super. Ct., App. Div., Aug. 28, 2008) (citation and internal quotation marks omitted).

"[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983). The admissibility of evidence is generally a question of state law which is not cognizable

under habeas review.  See Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal

habeas court, however, cannot decide whether the evidence in question was properly allowed

under the state law of evidence"); Hickey v. Jeffes, 571 F.2d 762, 766 (3d Cir. 1978) ("As to the

contention that the trial court erred in admitting the victim's testimony of a prior flirtatious

conversation, we find that, if there was any error in the court's ruling . . . that error was at best

one of interpretation of the state's law of evidence and did not arise to constitutional

dimensions").

       In Estelle v. McGuire, 502 U.S. 62 (1991), the Supreme Court held that the state court's

admission in petitioner's trial for murdering his infant daughter of the testimony of two

physicians that the child had suffered child abuse (evidence of rectal tearing that was six weeks

old and rib fractures that were seven weeks old) did not violate due process.

> The evidence of battered child syndrome was relevant to show
> intent, and nothing in the Due Process Clause of the Fourteenth
> Amendment requires the State to refrain from introducing relevant
> evidence simply because the defense chooses not to contest the
> point.  Concluding, as we do, that the prior injury evidence was
> relevant to an issue in the case, we need not explore further the
> apparent assumption of the Court of Appeals that it is a violation of
> the due process guaranteed by the Fourteenth Amendment for
> evidence that is not relevant to be received in a criminal trial.  We
> hold that McGuire's due process rights were not violated by the
> admission of the evidence.

Id. at p. 70.

       In cases not governed by the AEDPA, the Third Circuit has held that the admission of

evidence may violate due process where the evidence "undermine[d] the fundamental fairness of

the entire trial."  Keller v. Larkins, 251 F. 3d 408, 413 (3d Cir. 2001); see also Lesko v. Owens,

881 F. 2d 44, 51 (3d Cir. 1989) ("the erroneous admission of evidence that is relevant, but

excessively inflammatory, might rise to the level of a constitutional violation"); Bisaccia v.

Attorney General of State of New Jersey, 623 F. 2d 307, 313 (3d Cir. 1980) (when "the probative

value of . . . evidence, though relevant, is greatly outweighed by the prejudice to the accused

from its admission, then use of such evidence by a state may rise to the posture of fundamental

fairness and due process of law"). But § 2254(d)(1) of the AEDPA does not permit this Court to

grant habeas relief based on Third Circuit precedent.

Moreover, this Court is not aware of any Supreme Court case clearly establishing that the

admission of other crimes or bad acts evidence constitutes a violation of federal constitutional

rights, and Supreme Court cases suggest the contrary.  See, e.g., Estelle, 502 U.S. 62 (allowing

evidence of prior injuries in a trial for infant murder); Spencer v. Texas, 385 U.S. 554 (1967)

(rejecting due process challenge to admission of evidence of prior similar crimes when judge

gives limiting instruction).  "[The Supreme] Court has held on numerous occasions that it is not

an unreasonable application of clearly established Federal law for a state court to decline to apply

a specific legal rule that has not been squarely established by this Court."  Knowles v.

Mirzayance, __ U.S. __, 129 S. Ct. 1411, 1419 (2009) (quotations omitted).  Because the

admission of the evidence of Boretsky's violation of the domestic violence restraining order was

not contrary to, nor an unreasonable application of clearly established federal law, as determined

by the Supreme Court, Petitioner is not entitled to habeas relief under this ground.  See Albrecht

v. Horn, 485 F. 3d 103, 128 (3d Cir. 2007) ("Where evidence of a defendant's prior bad acts is

admitted, a defendant's interests are protected by a limiting instruction, which mitigates the

possibility of prejudice"); Charlton v. Franklin, 503 F. 3d 1112, 1115 (10th cir. 2007) (state

court's admission of evidence of petitioner's prior bad acts did not render trial fundamentally

unfair or warrant habeas relief); Minett v. Hendricks, 135 Fed. Appx. 547 (3d Cir. 2005)

(rejecting claim that admission of "other crimes" evidence is contrary to or an unreasonable

application of clearly established Supreme Court precedent).

(2) Failure to Instruct Regarding Purpose for Entering Home

In Ground Six, Boretsky asserts that his "burglary and felony murder convictions must be

reversed because the trial court failed to tailor the charge to the facts of the case and failed to

inform the jury that violation of a domestic violence restraining order does not satisfy the

requirements of a 'purpose to commit an offense therein.'" (Dkt. 1 at 8.)  In his direct appeal

brief, Boretsky factually supported the ground as follows:

> It was the State's theory at trial that defendant entered Lana's home on March 3,
> 2002, with the intent to commit an offense, i.e., either murder, assault, terroristic
> threats, or harassment.  Conversely, it was the defense theory that defendant went
> there with the intent to speak to Lana to resolve the issue of when Lana would be
> moving into her grandmother's house.  In other words, it was the defense theory
> that defendant, while entering the house in violation of the domestic violence
> restraining order, had no intent to commit any other offense.  The trial court,
> however, did not incorporate into its burglary charge defendant's alleged purpose
> in entering the home, thereby depriving the jury of an opportunity to reach a
> verdict consistent with defendant's version of the facts.  Moreover, the trial court
> failed to specifically instruct the jury that where, as here, the entry into the home
> is illegal because of a domestic violence restraining order, the illegality of the
> entry does not satisfy the requirement, for purposes of the burglary statute, that
> defendant entered the home with the purpose to commit an offense.  Thus,
> because the trial court failed to properly instruct the jury on burglary, defendant's
> burglary and felony murder convictions must be reversed.

State v. Boretsky, Docket No. A-6607-05T4 defendant's brief at 37-38 (N.J. Super. Ct., App.

Div., undated).  The government argues that Ground Six does not present a federal claim.

Boretsky presented this claim on direct appeal.  The Appellate Division rejected the claim

as follows:

> We likewise reject defendant's arguments . . . that the jury charge on burglary was erroneous in that it was not properly tailored and failed to inform the jury specifically that violation of a domestic violence restraining order does not establish one of the essential predicates for the crime of burglary.  We do not read the record as containing the flaws on which these arguments are premised.

Boretsky, 2008 WL 4057972 at *5.

A habeas petitioner who challenges state jury instructions must "point to a federal requirement that jury instructions on the elements of an offense . . . must include particular provisions" or demonstrate that the jury "instructions deprived him of a defense which federal law provided to him."  Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).   This is because district courts do not "sit as super state supreme courts for the purpose of determining whether jury instructions were correct under state law with respect to the elements of an offense and defenses to it."  Id.  See also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some [constitutional right]") (citations and internal quotation marks omitted).  As the Third Circuit explained,

> In considering whether this case involves a claim of error under the Constitution, laws, or treaties of the United States, it is critical to remember that the Supreme Court has made it clear that the states define the elements of state offenses. Accordingly, while there may be constitutionally required minimum criteria which must be met for conduct to constitute a state criminal offense, in general there is no constitutional reason why a state offense must include particular elements. *See McMillan v. Pennsylvania,* 477 U.S. 79, 84-86, 106 S.Ct. 2411, 2415-16, 91 L.Ed.2d 67 (1986).
>
> It thus follows that for the error of state law in the justification instructions, assuming that there was an error, to be meaningful in this federal habeas corpus action, there would have to be a body of federal law justifying the use of deadly force which is applicable in a state criminal action charging an offense based on the defendant's

41

use of that force. Then the error in the jury instructions would be significant if the instructions did not satisfy that body of law. Put in a different way, the jury instructions on justification, even if correct under state law, would need to have relieved the state of the necessity of proving an element of the offense as required by federal law or to have deprived the petitioner of a defense the state had to afford him under federal law in order to be significant in a federal habeas corpus action. If we concluded that a petitioner could obtain habeas corpus relief without making such a showing, then district courts in habeas corpus cases would sit as super state supreme courts for the purpose of determining whether jury instructions were correct understate law with respect to the elements of an offense and defenses to it.

Johnson, 117 F.3d at 110.

To the extent that Boretsky contends that the instructions were unconstitutional because the judge did not specifically relate the law to the facts of the case, the claim fails because Supreme Court precedent does not require the instructions to relate the law to the facts. See Montana v. Egelhoff, 518 U.S. 37 (1996); Goodwin v. Johnson, 132 F.3d 162, 191 (5th Cir. 1997). And "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." Estelle, 502 U.S. at 71-72; see also Engle v. Isaac, 456 U.S. 107, 119 (1982) ("Insofar as respondents simply challenge the correctness of the self-defense instructions under Ohio law, they allege no deprivation of federal rights and may not obtain habeas relief"). Boretsky is not entitled to habeas relief on Ground Six because the New Jersey courts' rejection of the claim was not contrary to, or an unreasonable application of any Supreme Court holding. See Smith v. Spisak, __ U.S. __, 130 S. Ct. 676, 684 (2010) (no right to habeas relief if Supreme Court has not previously held jury instruction unconstitutional for same reason); Dansby v. Trombley, 369 F. 3d 657, 659 (6th Cir. 2010) ("Dansby's [§ 2254] claim fails because the

42

Supreme Court has never held that due process requires the giving of jury instructions on lesser-included offenses in noncapital cases").

(3) Failure to Instruct on Attempt

In Ground Eight, Boretsky contends that "the trial court committed reversible error by allowing the jury to consider that the defendant caused serious bodily injuries, or caused significant bodily injuries. The jury's consideration should have been limited to attempt to cause serious or significant bodily injury only." (Dkt. 1 at 8.) Boretsky raised this ground on direct appeal in two pages of his pro se supplemental brief, arguing that, because the evidence was insufficient to allow the aggravated assault charge to be submitted to the jury on a theory that the defendant actually caused serious or significant bodily injury, the failure to limit the jury's consideration to attempt had the clear capacity to confuse the jury.

The Appellate Division rejected the claim as follows:

Defendant argues . . . that the trial court erred in allowing the jury to consider the charge of aggravated assault rather than limiting the jury's consideration to attempted aggravated assault. Defendant contends that the injuries inflicted on Lana on January 19, 2002, were not, as a matter of law, sufficiently grave to satisfy the serious injury predicate for a charge of aggravated assault; and, consequently, that the only crime that could validly be considered was attempted aggravated assault. The broken nose and laceration incurred here were similar to those depicted in Kane[, 335 N.J. Super. 391, 398-99 (App. Div. 2000),] and Green[, 318 N.J. Super. 361 (App. Div. 1999), aff'd o.b., 163 N.J. 140 (2000)], respectively, and, in each case discretely, regarded as insufficiently grave to support a determination that an aggravated assault as defined by N.J.S.A. 2C:12-1b(1) had occurred. Nevertheless, given the combination of injuries, the general bruising, the extensive bleeding, and the resulting scar that were depicted here, we decline to view the trial judge's evaluation in this case to have been a misapplication of the discretion reposed in trial courts to interpret and apply the statutory standard. With due deference to the discretionary exercise, we reject defendant's argument in this regard[.]

Boretsky, 2008 WL 4057972 at *6.

Here, Boretsky does not show that there was a reasonable likelihood that the jury applied the aggravated assault instructions in a way that relieved the state of its burden of proving the elements of aggravated assault; nor does he point to a federal requirement that jury instructions must include an "attempt" instruction, or show that the absence of an attempt instruction deprived him of a defense which federal law provided to him.  See Williams v. Beard, 637 F. 3d 195, 223-25 (3d Cir. 2011).  Moreover, Boretsky cites no Supreme Court authority for the proposition that the jury instructions were contrary to or an unreasonable application of a clearly established federal right, as determined by a Supreme Court holding.  He is therefore not entitled to habeas relief on Ground Eight.

(4) Instruction Relieved State of Proving Unreasonable Doubt Standard

In Ground Fourteen, Boretsky argues that "during jury summation, the trial judge gave the jury incorrect (as a matter of law) instruction as to how to weigh the evidence, relieving the prosecutor from its burden of proving its case beyond a reasonable doubt."  (Dkt. 1 at 12.) Boretsky raised Ground Fourteen on direct appeal in his pro se supplemental brief, stating that the judge improperly instructed the jury:  "It's the quantity of the evidence not simply the number of witnesses that control.  Anything not marked in evidence can't be given to you in the jury room even though it may have been marked for identification."  State v. Boretsky, Ind. No. 02-05-00642 transcript at 111 (N.J. Super. Ct., Law Div., Jan. 6, 2006).  Boretsky argued that this instruction violated due process because it told the jury that their decision of guilt or innocence is to be based upon the quantity of evidence, which indicates that the jury may convict not upon finding of guilt beyond a reasonable doubt but simply by a preponderance of the evidence.  The Appellate Division rejected the claim as follows:

Finally, defendant argues . . . that the single isolated remark in the transcript of the trial judge's instructions to the jury, "It's the *quantity* of the evidence, not simply the number of witnesses that control" (emphasis supplied), improperly diluted the State's burden of proving its case beyond a reasonable doubt.  Such an instruction, if given as depicted in the transcript, would have been manifestly incorrect, though not necessarily reversible error.  Because the text as given is a single instance in a lengthy jury charge replete with accurate and carefully drawn, correct references to and descriptions of the State's burden of proof, we take this fleeting reference to have been either a slip of the tongue by the judge or an erroneous transcription by the court reporter.  Our analysis of the record with the jury charge taken as a whole leads us to conclude that the jury was well-instructed regarding the State's burden of proof and could not have been under any misapprehensions in that regard.  The lack of an objection at the time is a serious omission, for, if an objection had been lodged, the trial court would have had an opportunity to remedy any error in the instruction before the case went to the jury.

Boretsky, 2008 WL 4057972 at *8 (citations omitted).

The Due Process Clause of the Fourteenth Amendment requires proof beyond a reasonable doubt of every fact necessary to constitute the elements of the crime.  See In re Winship, 397 U.S. 358 (1970).  In Waddington v. Sauausad, 129 S. Ct. 823 (2009), the Supreme Court outlined the law regarding the constitutionality of state court instructions:

Even if there is some ambiguity, inconsistency, or deficiency in the instruction, such an error does not necessarily constitute a due process violation.  Rather, the defendant must show both that the instruction was ambiguous and that there was " 'a reasonable likelihood' " that the jury applied the instruction in a way that [violated the Constitution].  Estelle, supra, at 72, 112 S.Ct. 475 (quoting Boyde v. California, 494 U.S. 370, 380 . . . (1990)).  In making this determination, the jury instruction "may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  Estelle, supra, at 72.  Because it is not enough that there is some "slight possibility" that the jury misapplied the instruction, Weeks v. Angelone, 528 U.S. 225, 236 . . . (2000), the pertinent question "is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' " Estelle, supra, at 72, 112 S.Ct. 475 (quoting Cupp, supra, at 147, 94 S.Ct. 396).

45

Waddington, 129 S.Ct. at 831 -832 (2009) (citations and internal quotation marks omitted).

In the context of the instructions as a whole, Boretsky is not entitled to habeas relief on the basis of the isolated deficient instruction.  The New Jersey courts' adjudication of the claim was not contrary to, or an unreasonable application of Supreme Court holdings on ambiguous or deficient instructions.  See Waddington, 129 S.Ct. at 831 -832; Williams v. Beard, 637  F. 3d 195, 223 (3d Cir. 2011) ("Here, even if the trial court's accomplice liability charge was in some respect ambiguous, there is no reasonable likelihood that the jury applied the instruction in a manner that relieved the Commonwealth of its burden of proof with respect to first degree murder"); Jacobs v. Horn, 395 F. 3d 92, 111 (3d Cir. 2005) ("On federal habeas review, the relevant question is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process . . . , not merely whether the instruction is undesirable, erroneous, or even universally condemned'") (quoting Henderson v. Kibbe, 431 U.S. 145, 154 (1977), and Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)).

## C.  Due Process - Failure to Sever

In Ground Four, Boretsky claims that "the court committed reversible error in its refusal to sever the counts charging contempt for violation of a restraining order."  (Dkt. 1 at 7.)  Relying on State v. Chenique-Puey, 145 N.J. 334 (1996), and State v. Silva, 378 N.J. Super. 321 (App. Div. 2005), Boretsky presented Ground Four to the Appellate Division on direct appeal, arguing that, under New Jersey law, the failure to sever charges of terroristic threats and violation of a domestic violence restraining order from the other counts, was reversible error.  The Appellate Division rejected the claim as follows:

> We also reject the argument that the trial court erred in its pre-trial ruling denying defendant's motion to sever the charges for contempt of the domestic violence restraining order.  The motion judge was eminently correct in his view, distinguishing the barring effect of the rule of State v. Chenique-Puey . . . that there was an "inextricable interaction and meshing between the restraining order and the defendant's mental state . . . .  The jury could reasonably infer that the defendant was angry at being barred from his marital home.  In order to reach that inference they would have to know that he was barred from the marital home . . . .  The rule of Chenique-Puey cannot be seen to apply without exception regardless of particular circumstances.  Here, the restraining order had much less to do with bolstering the State's case on the terroristic threats charge, as in Chenique-Puey, than its capacity to establish intent or motive in respect of the homicide charges, especially in the light of defendant's assertion that the victim had committed suicide.  The trial court's repeated and well-crafted limiting instructions protected defendant from improper use by the jury of the evidence regarding the restraining order.

Boretsky, 2008 WL 4057972 at *5 (citations omitted).

The Supreme Court has observed that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." United States v. Lane, 474 U.S. 438, 446 n. 8, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986).  Denial of a motion to sever violates due process "only if there is a serious risk that a joint trial would compromise a specific right of . . . the defendant[ ], or prevent a jury from making a reliable judgement about guilt or innocence.  Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant . . . .  [L]ess drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."  Zafiro v. United States, 506 U.S. 534, 539 (1993). Moreover, "a fair trial does not include the right to exclude relevant and competent evidence." Id. at 540 (citation and internal quotation marks omitted).

47

In this case, the joinder of the charges of violation of a restraining order with the murder charge allowed the state to present the full chronology of related events, avoided the need to repeat evidence at separate trials, and did not compromise a specific right of Petitioner or prevent the jury from reliably judging Petitioner's guilt or innocence.  Thus, joinder of charges did not deny Petitioner a fair trial and the New Jersey courts' adjudication of the claim was not contrary to, or an unreasonable application of Lane or other Supreme Court holdings.  See Cummings v. Sirmons, 506 F.3d 1211, 1239 (10th Cir.2007) (where "it seems inconceivable that the State could have prosecuted Cummings for Melissa's murder without being permitted to provide the jury with some evidence regarding the events leading up to Melissa's death," failure to sever was not unreasonable application of Lane ); Davis v. Coyle, 475 F.3d 761, 777 (6th Cir.2007) ("By allowing joinder of offenses, the possibility exists that a jury may use the evidence of one of the charged crimes to infer a general criminal disposition by the defendant; the jury also may confuse or cumulate the evidence of the various crimes charges. The prejudice that Davis must demonstrate, however, in order to justify a grant of a writ of habeas corpus is actual prejudice, not merely the potential for prejudice") (citations omitted; emphasis in original); Comer v. Schriro, 463 F.3d 934, 957-59 (9th Cir.2006) (state death penalty trial was not rendered fundamentally unfair by joinder of homicide count with kidnapping, robbery and sexual assault charges, since some evidence was admissible as to all counts, jury instruction limited prejudice, and evidence relating to all counts was strong); Johnson v. Bett, 394 F.3d 1030 1037 (7th Cir.2003) (joinder of defendants did not violate due process where "[t]rying them together allowed the State to present a chronology of what happened" and avoided repetition of evidence at separate trials); Herring v. Meachum, 11 F.3d 374, 377-78 (2nd Cir.1993) ("where a defendant

48

is claiming a due process violation based upon joinder of offenses, he must, to succeed, go beyond the potential for prejudice and prove that actual prejudice resulted from the events as they unfolded during the joint trial").

## D.  Due Process - Prosecutorial Misconduct

In Ground Seven, Boretsky contends that "during the trial and summation, the prosecutor committed several acts of misconduct which violated defendant's due process right to a fair trial."  (Dkt. 1 at 8.)  Boretsky presented this ground on direct appeal in his pro se supplemental brief, stating:

> During the cross-examination of Dr. Weinapple, the prosecutor used the words "murder" and "killing" in regards to the death of the victim, Saoule Moukhametova.  After a timely objection by defense counsel the prosecutor again used the wor[d] "killed" with respect to Saoule Moukhametova . . . .  The defense promptly objected, yet the improper remarks were not withdrawn and the Court neither struck the comments from the record nor did he give curative instructions to the jury.  It took a threat by the judge to impose a $500.00 sanction and embarrassment in front of the jury to stop him.

> During summation, the prosecutor used the words "we know" <u>THIRTY-FIVE-TIMES</u>, or on average every four-and-one-half minutes during his two-hour-and-forty minute closing argument.

> In the context of this case, the jury could have easily drawn an inference that the prosecutor had superior knowledge other than the presented evidence indicated.

> The prosecutor stated that the defendant lied to the police, thus impermissibly infringing upon the exclusive province of the jury . . .

> The prosecutor referred to the defendant's "silence" as an admission of guilt.

> By making an excessive comment on the defendant's financial condition, with the emphasis on the lack of funds to pa[y] his obligations, as well as the fact that he is supporting two households in conjunction with his desire to move back into the ho[u]se, created an impermissible inference as to a motive to commit the crime in question . . .

In summation the Prosecutor denigrated the suicide defense by saying: "This case is about murder and nothing less than murder."

This statement clearly imparts upon the jury that he had superior knowledge independent of the evidence presented at trial . . .

State v. Boretsky, Docket No. A-6607-05T4 pro se suppl. brief at 3-5 (N.J. Super. Ct., App. Div. undated).

The Appellate Division rejected the argument as follows:

Defendant's arguments regarding prosecutorial misconduct during cross-examination of defendant's psychiatric expert and in summation are also lacking in merit. The trial judge was appropriately proactive in correcting and remedying the use of improper terminology in cross-examination. The statements in summation of which defendant complains were in the category of fair comment on the record. Defendant was adequately protected from the jury's undue reliance on such statements by the court's standard instructions that the attorneys' summations were not evidence and that the jury's recollection and evaluation of the evidence controlled.

Boretsky, 2008 WL 4057972 at *6.

Prosecutorial misconduct may "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). This occurs only if the misconduct constitutes a "failure to observe that fundamental fairness essential to the very concept of justice." Id. at 642; see also Greer v. Miller, 483 U.S. 756, 765 (1987) (To violate due process, "the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial") (citation and internal quotation marks omitted). It is not enough to show that the prosecutor's conduct was universally condemned. See Darden v. Wainwright, 477 U.S. 168, 181 (1986). The quantum or weight of the evidence is crucial to determining whether the prosecutor's statements before the jury were so

50

prejudicial as to result in a denial of due process.  See Darden, 477 U.S. at 182; Donnelly, 416

U.S. at 644; Moore v. Morton, 355 F.3d 95, 111 (3d Cir. 2001).

Here, the prosecutor's comments during the cross-examination of Boretsky's psychiatric

expert and in summation did not infect his trial with unfairness as to make the resulting

conviction a denial of due process under Donnelly, 416 U.S. at 643.  See Gooding v. Wynder,

2012 WL 207068 (3d Cir. Jan. 25, 2012).  Thus, the New Jersey courts' adjudication of

Petitioner's prosecutorial misconduct claims was not contrary to, or an unreasonable application

of Supreme Court precedent, and Petitioner is not entitled to habeas relief under Ground Seven.

E.  Due Process - Admission of Evidence

In Grounds Three and Nine, Boretsky challenges the admission of evidence on due

process grounds.  In Ground Three, he contends that "[b]y admitting the Medical Examiner's

testimony that the death was "HOMICIDE," the Court effectively relieved the State of burden to

prove beyond a reasonable doubt that the "HOMICIDE" was committed."  (Dkt. at 7.)  In Ground

Nine, he claims that the trial court denied his right to a fair trial by "allowing the state to display

to the jury pictures depicting injuries sustained by Saoule Moukhametova on the night of January

19, 2002 where the least possible inflammatory evidence to prove this point was available

through the testimony of Dr. Garibaldi and Officer Drost."  Id. at 8.  Boretsky raised these claims

on direct appeal.  The Appellate Division rejected these claims as follows:

> No error of any kind ensued, either, from receipt of the medical examiner's
> opinion that the victim's death was the result of homicide.  The views expressed
> were based upon well-articulated factual elements that satisfied the limitations
> governing such testimony, i.e., narrating the psysiological status of the body at the
> time of death, and ruling out the possibility that the injuries were self-inflicted or
> sustained as a result of mere inadvertence.

*                              *                              *

  [W]e reject defendant's . . . argument that plain error eventuated from the use of
photographs of the injuries inflicted on the victim on January 19, 2002.

Boretsky, 2008 WL 4057972 at *5, *6 (citations and internal quotation marks omitted).

   This Court agrees with the government that, although he mentions the Due Process

Clause in the heading, the question of the admission of this testimony and evidence is essentially

a state law claim.  But "errors of state law cannot be repackaged as federal errors simply by citing

the Due Process Clause."  Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).  Moreover,

"it is well established that a state court's misapplication of its own law does not generally raise a

constitutional claim."  Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citations and internal

quotation marks omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

"[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review

of the wisdom of state evidentiary rules."  Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983).

   As previously mentioned, in Estelle v. McGuire, 502 U.S. 62 (1991), the Supreme Court

held that the state court's admission in petitioner's trial for murdering his infant daughter of the

testimony of two physicians that the child had suffered child abuse (evidence of rectal tearing

that was six weeks old and rib fractures that were seven weeks old) did not violate due process.

Id. at 70.  Boretsky has not cited any Supreme Court case clearly establishing that the admission

of prejudicial photos or the medical examiner's testimony that the cause of death was homicide,

constitutes a violation of federal constitutional rights.  Because the admission of the challenged

evidence was  not contrary to, or an unreasonable application of, clearly established federal law,

as determined by the Supreme Court, Petitioner is not entitled to habeas relief under Grounds

Three and Nine.  See Moses v. Payne, 555 F. 3d 742, 761 (9th Cir. 2009) (admission of opinion testimony of medical examiner that victim died by homicide rather than suicide was not contrary to or unreasonable application of clearly established federal law); United States v. Lockett, 919 F.2d 585, 590 (9th Cir. 1990) ("Although "[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact"); see also Watkins v. Meloy, 95 F. 3d 4, 7 (7th Cir. 1996) ("If the evidence is probative, it will be very difficult to find a ground for requiring as a matter of constitutional law that it be excluded; and if it is not probative, it will be hard to show how the defendant was hurt by its admission"); Hickey v. Jeffes, 571 F.2d 762, 766 (3d Cir. 1978) ("As to the contention that the trial court erred in admitting the victim's testimony of a prior flirtatious conversation, we find that, if there was any error in the court's ruling . . . that error was at best one of interpretation of the state's law of evidence and did not arise to constitutional dimensions").

## F.  Sufficiency of Evidence of Terroristic Threats

In Ground Five, Boretsky argues that because "the state failed to prove the elements of terroristic threats beyond a reasonable doubt, the trial judge erred in denying defendant's motion for a judgment of acquittal on count two."  (Dkt. 1 at 8.)  A sufficiency of the evidence claim is governed by Jackson v. Virginia, 443 U.S. 307, 318 (1979).  "[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 - if the settled procedural prerequisites for such a claim have otherwise been satisfied - the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Id. at 324; accord McDaniel v. Brown, 130 S. Ct. 665, 666

(2010) (per curiam).  <u>Jackson</u> "requires a reviewing court to review the evidence in the light most favorable to the prosecution.  Expressed more fully, this means a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  <u>McDaniel</u>, 130 S. Ct. at 673 (quoting <u>Jackson</u>, 443 U.S. at 326); <u>see also</u> <u>House v. Bell</u>, 547 U.S. 518, 538 (2006) ("When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict").  The Court emphasized that "the standard . . . does not permit a court to make its own subjective determination of guilt or innocence."  <u>Jackson</u> at 320, n. 13.  Moreover, "a reviewing court must consider all of the evidence admitted by the trial court, regardless whether that evidence was admitted erroneously."  <u>McDaniel</u>, 130 S. Ct. at 672 (citation and internal quotation marks omitted).  Moreover, "under <u>Jackson</u>, the assessment of credibility of witnesses is generally beyond the scope of review."  <u>Schlup v. Delo</u>, 513 U.S. 298, 330 (1995).  The question is "whether, viewing the evidence in the light most favorable to the state, it was objectively unreasonable for the Appellate Division to conclude that a rational trier of fact could have found, beyond a reasonable doubt that [petitioner] was guilty[.]"  <u>Kamienski v. Hendricks</u>, 2009 WL 1477235 (3d Cir. May 28, 2009).

In this case, the Appellate Division rejected Boretsky's sufficiency of the evidence claim as follows:

> No basis exists for reversing the trial judge's denial of defendant's motion for a judgment of acquittal on the terroristic threats charge.  Viewing the evidence . . . in its entirety and giving the State the benefit of all its favorable inferences that could be drawn from that evidence, ample basis existed in the record from which

the jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.

Boretsky, 2008 WL 4057972 at *5 (citations and internal quotation marks omitted).

This Court finds that the New Jersey courts' rejection of Boretsky's sufficiency of the evidence claim with respect to terroristic threats was not contrary to, or an unreasonable application of Jackson and its progeny. Petitioner is not entitled to habeas relief on Ground Five.

G. Confrontation Clause

In Grounds Twelve through Fourteen, Boretsky contends that the admission of statements made by the victim violated his rights under the Confrontation Clause: (1) Lana's statement on February 10, 1999, to EMT Lemmerling that she tried to cut her wrist because her husband was beating her (Dkt. 9-6); (2) Lana's statement on February 10, 1999, in the physician note of the emergency room form, that she told Dr. Utkewicz, the ER physician, that "[p]atient states she tried to commit suicide after being physically bused by her husband" (Dkt. 9-21 at 129-130); and (3) Lana's statement on the evening of January 19, 2002, to municipal court judge Mary Casey, when Lana applied over the telephone to Judge Casey for a domestic violence temporary restraining order (Dkt. 9-6 at 112).

All three statements were elicited on cross-examination of defense witnesses or in the state's rebuttal to the case of the defense. The defense called ER physician Dr. Utkewicz to testify. On direct examination, defense counsel asked Dr. Utkewicz whether he recalled seeing Lana in the ER of Robert Wood Johnson University Hospital on the evening of February 10, 1999, through the early morning hours of February 11, 1999, and Utkewicz did not recall, so defense counsel asked him to testify from the records of the visit, which consisted of the triage

form, physician notes, and ER face sheet.  (Dkt. 9-21 at 121.)  Testifying from these records, Dr.

Utkewicz testified that Lana arrived on February 10, 1999, at 11:10 p.m.; Dr. Utkewicz

physically examined her and noted no remarkable physical findings in the physician note; the

triage assessment form indicated that the chief complaint was a superficial laceration to her left

writs; the toxicological screening showed positive for barbiturates and benzodiazepines and

alcohol at twice the level of intoxication for operating a vehicle in New Jersey; patient was

discharged to South Amboy Psychiatric facility.  (Dkt. 9-21 at 122-125.)   On cross-examination,

the prosecutor asked whether Dr. Utkewicz had taken a history of the present illness and Dr.

Utkewicz referred to the physician note.  Id. at 126.  Over objection, the prosecution asked Dr.

Utkewicz whether the physician note stated:  "Patient states she tried to commit suicide after

being physically abused by her husband," and Dr. Utkewicz answered "Yes," adding that patient

stated that she tried to cut her wrist.  Id. at 129-130.  The trial judge allowed this on the ground

that it showed Lana's state of mind and because the defense had "opened the door" by calling Dr.

Utkewicz to testify from the hearsay in the ER records.

  The defense also called Dr. Martin Weinapple as an expert witness in psychiatry.  On

direct, Dr. Weinapple testified that he had reviewed various records, including the EMT report by

Lemmerling for February 10, 1999, and the ER reports, including Dr. Utkiewicz' note, from

February 10, 1999, and he had interviewed Boris Boretsky.  (Dkt. 9-6 at 25-27.)  Ultimately, he

testified on direct that, in his opinion, on March 3, 2002, Lana was at high risk for suicide, with

two of the risk factors being Lana's February 1999 suicide attempt and her suffering from

physical and emotional abuse.  Id. at 51-53.  On cross examination, Dr. Weinapple acknowledged

that he had reviewed the ER records from February 1999; he was aware that Lana told Dr.

Utkiewicz that she had tried to commit suicide after being physically abused by her husband; he

was aware that on February 10, 1999, Lana told the EMT Lemmerling that her husband beat her

when an argument broke out and that she could not stand the beatings and she tried to commit

suicide by cutting her wrist.  Id. at 70-71.  Over defense objection, Dr. Weinapple testified on

cross that he had reviewed the transcript of Lana's statements to municipal court Judge Casey on

January 19, 2002, in which Lana referred to the February 1999 incident; the prosecutor cross

examined Weinapple, reading from the transcript of the call to Judge Casey, as follows:

> Q:  And she told the police and she told Judge Casey - I'm quoting from the
> transcript - and while he beat me and I said I want to kill myself and he put me in
> a mental institute I mean in Princeton Hospital I, I just told him I want to kill
> myself because I don't want to live with him and he said to me and he told you the
> hospital and they came and they put me in, I don't remember the names of the
> institute.  The judge says okay.  And Miss Moukhametova goes on to explain yes,
> and he put me in this institute and I mean just like, you know, like I tried to scare
> him.  The judge says okay.  And Miss Moukhametova responds I mean not, not
> just like I want to do this.  Now, clearly Miss Moukhametova was telling Judge
> Casey that what happened was not a suicide attempt at all; that she had been
> beaten and that she was trying to get away from him and to scare him, is that
> correct?
>
> A:  It's clearly in the transcript but I don't know how clearly it is as a statement.
>
> Q:  That's what she said?
>
> A:  It's clearly written that way as what she says in the transcript.  I don't know
> how, as I explained before or tried to, that people can change, you know, when
> they're suffering from emotional stress or they're suicidal or they come before
> certain circumstances where they can try to explain themselves in different kinds
> of ways but I would give it perhaps in the situation different interpretations.
>
> Q:  If we take her at her word she was clearly telling us this wasn't a suicide
> attempt but attempt to scare Mr. Boretsky and get away from him, correct?
>
> A:  It says that.  This is the transcript of that comment that you made, that's
> correct . . . .  It's not clear though.

(Dkt. 9-6 at 112-113.)

Next, defense counsel questioned Dr. Weinapple on redirect about Lana's statement to Judge Casey on January 20, 2002.  Id. at 170-171.  Over objection, the trial judge allowed the prosecutor to introduce the following on rebuttal:  EMT Lemmerling's testimony regarding what Lana told him on February 10, 1999, and a tape recording of Lana's telephone statement on January 20, 2002, to Judge Casey, was played to the jury.  Lemmerling testified that he went to the Boretsky home on February 10, 1999, in response to a 9-1-1 call reporting a suicide attempt. (Dkt. 9-6 at 191.)  Lemmerling testified on rebuttal from his report that in the ambulance on the way to the hospital Lana stated she "had been drinking with husband when the argument broke out.  She stated he beat her and she could not stand the repeated beating and tried to commit suicide by cutting her wrist."  Id. at 196-197.

> After Lemmerling's testimony, cross, and redirect, the judge instructed the jury:
>
> THE COURT:  Ladies and gentlemen, we have this third stipulation signed by [the prosecutor and defense counsel] on behalf of the State and Mr. Boretsky.  The State and defense agree that the following is a recorded excerpt from a telephone conversation between Mary Casey, Municipal Court judge, South Brunswick, and Saoule Moukhametova - Lana - on January 20, 2002, during the application for a temporary restraining order.  The statement allegedly pertains to an incident on February 11, 1999.  Okay?  So we're going to play the tape.  We have the transcript.  Again, what's on the tape controls and not the transcript, ladies and gentlemen.  It's very brief.  This transcript is S-227 and the tape is S-138.
>
> (There is a pause.)
>
> THE COURT:  Everybody has a copy?  Everybody is okay?  We'll play the tape. Thank you.
>
> (Tape is played.)
>
> THE COURT:  Thank you, ladies and gentlemen.  Pass over the transcript. Tonight you're not to discuss the case, not to make any comments.  Keep an open

58

mind.  Tomorrow morning you'll hear the summations.  First you'll hear from Mr. Benedict and then you'll hear from the prosecutors, I'm not sure both defense attorneys.

(Dkt. 9-6 at 201-202.)

This Court has reviewed the transcripts of the testimony of Dr. Weinapple, Dr. Utkiewicz, Mr. Lemmerling, and the instructions, and has been unable to locate any instruction specifically directing the jury to limit the use of Lana's statements in any way.  The trial judge did instruct the jury, however, that testimony regarding January 19 and 20, 2002, incident could not be used to prove that Boretsky committed murder on March 3, 2002, but could, if believed, be considered by the jury for the purpose of proving motive or intent on the part of Boretsky as to the alleged murder on March 3, 2002.  The trial judge further instructed the jury:

> You may not find the defendant guilty simply because the State has offered evidence that he committed other crimes, wrongs or acts.  Also, the alleged incident involved, alleged assault in 1998, in1999, may only be used to show the alleged state of mind of [Lana] and concerning her risk of suicide and for no other purpose whatsoever.  You cannot consider it at all concerning the charges against Mr. Boretsky that are contained in the indictment.  It can only be used for the state of mind as to [Lana] as to whether her risk of suicide going back 1998, 1999.

> Now, ladies and gentlemen, you have heard testimony received regarding a temporary restraining order obtained by [Lana] against Mr. Boretsky on January 20, 2002.  I want to emphasize to you the Sough Brunswick Municipal Court did not make any final determination regarding whether or not Mr. Boretsky committed any offense when it issued that order.  The existence of the temporary restraining order may not be used by you as a jury to infer that the defendant committed any offense and the temporary restraining order is not proof of an offense.  Evidence regarding the temporary restraining order is limited for a limited purpose and can be only used for a limited purpose.

> As you know, count 3 of the indictment charges Mr. Boretsky with contempt for allegedly violating the temporary restraining order issued by the South Brunswick Municipal Court on January 20, 2002, and the evidence on that was offered to establish the existence of a court order that the State alleges that Mr. Boretsky violated for the purpose of proving count 3 of the indictment.  It's also offered by

59

the State as proof of motive for the defendant to allegedly threaten to kill [Lana] on January 30th and is thus offered as part of the proofs of the indictment charges him with terroristic threats.

The State further alleges you can consider the temporary restraining order as part of the motive for the defendant to allegedly assault or allegedly murder [Lana] on March 3rd, 2002, so you can accept or reject the State's allegations regarding the significance of the temporary restraining order as it pertains to motive. You are permitted to give these allegations as much or as little weight as you deem appropriate.

You cannot consider the evidence regarding the temporary restraining order for any other purpose. You cannot consider the evidence regarding the temporary restraining order issued on January 20th to draw any inference that the defendant committed an act, an offense, at any time prior to the incident that occurred on March 3rd, 2002; therefore, it was more likely committed the alleged crimes which he's charged with in the indictment.

(Dkt. 9-8 at 85-89.)

Boretsky presented the Confrontation Clause grounds to the Appellate Division on direct

appeal in his pro se supplemental brief. The Appellate Division rejected the claims as follows:

Defendant does not take issue, directly, with the trial court's rejection, on excited utterance grounds, of defendant's pre-trial motion to exclude the testimony of the police officers who responded to the scene on January 19, 2002, regarding Lana's statements to them. Rather, he argues that the testimony of Lana's stepsister, who defendant also struck at the time, should have been excluded in respect of statements Lana made to her. We discern no error, plain or otherwise, in the admission of that testimony.

No error was committed by the trial court, either, in allowing the State, on cross-examination of a defense witness, a treating emergency room physician, to elicit hearsay testimony (the statements of Lana, his patient) expanding upon his testimony regarding a suicide attempt by Lana on February 10, 1999. The cross-examination was properly allowed on the basis articulated by the trial judge, that defendant had "opened the door" to the subject. Moreover, defendant was protected from improper use of the hearsay evidence by the judge's limiting instruction to the jury.

A closer question is presented by the permitted use of Lana's statements (hearsay) in the cross-examination of defendant's psychiatric expert who testified on direct

examination, inter alia, that because Lana had once before attempted suicide, in 1999, she was at greater risk for suicide subsequently, on March 3, 2002, the date of her death. To challenge that conclusion, the State introduced statements concerning the 1999 incident that Lana had made on January 19, 2002, to the municipal court judge who, by telephone, considered her application for a TRO. In dealing with a defense objection, the trial judge, after determining that the testifying expert, in formulating his opinion, had reviewed the transcript of the telephone conversation between Lana and the municipal court judge, permitted the prosecutor to question the expert regarding a certain portion of the transcript. Following the ensuing colloquy, the pertinent excerpt from the audio tape of the conversation was played for the jury. Defendant had objected initially to this proffer, but entered into a stipulation with the State identifying the contents of the taped excerpt.

We accept defendant's argument that the trial court's rulings allowing the line of inquiry and permitting the tape to be played for the jury nominally violated the Sixth Amendment Confrontation Clause standard established in Crawford v. Washington, 541 U.S. 36 . . . (2004). As a general rule, the testimonial statement of an absent witness offered for its truth may not be admitted against an accused in a criminal trial unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. See id. at 50-59.  It is immaterial whether the statement qualifies as an exception to the hearsay rule. See id. at 61-62.

It is beyond question that the statement to the municipal judge was testimonial evidence under the Crawford rule. See id. at 68; see also Davis v. Washington, 547 U.S. 813, 822 (2006). The statement was not essential to the resolution of an emergency that existed at the time it was made; rather, it was an effort "to learn ... what had happened in the past." Id. at 827.

Nevertheless, the State was entitled to use hearsay statements relied upon by the expert to expose, as fully as possible, the bases for his opinion. See N.J.R.E. 705. Also, as we have previously noted, the trial judge's limiting instruction aided the jury in understanding how such evidence might be properly used and in eliminating the possibility that it would unduly influence the jury, in the N.J.R.E. 404(b) sense, as the jury considered the crimes charged.

Even though no error can be assigned to the ruling regarding the scope of the State's cross-examination of the expert, the use of the hearsay evidence on cross-examination did not render the evidence itself admissible. Yet, erroneous admission of testimonial hearsay in violation of the Confrontation Clause is "simply an error in the trial process itself ... [that may be] affirm[ed] if the error was harmless." United States v. Jimenez, 513 F.3d 62, 78 (3d Cir.2008) (quoting

61

United States v. Hinton, 423 F.3d 355, 361-62 (3d Cir.2005) (internal quotation marks omitted), cert. denied, sub nom. Abreu v. United States, ---U.S. ----, 128 S.Ct. 2460, 171 L. Ed.2d 233 (2008). We regard the taped statement, itself, to have been cumulative in respect of the evidence already offered through the examination and cross-examination of the treating physician and the psychiatric expert. Its erroneous admission was harmless error. Similarly, the testimony of the State's rebuttal witness was also cumulative in the same sense, and any error that may have resulted from its admission was also harmless.

Boretsky, WL 4057972 at 6-8 (citations omitted).

The Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This guarantee applies to both federal and state prosecutions. See Pointer v. Texas, 380 U.S. 400 (1965). In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that the Sixth Amendment's Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant has had a prior opportunity for cross-examination." Id. at 53-54; see also Davis v. Washington, 547 U.S. 813 (2006) . The Court defined "testimony" as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact. An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Crawford, 541 U.S. at 51 (citations and internal quotation marks omitted). As the Supreme Court explained in Michigan v. Bryant, 131 S.Ct. 1143, 1155 (2011),

> Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial. When . . . the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the Clause. But there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary

> purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant.  Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause

Id. (footnote omitted).

Here, the government argues that there was no violation of the Confrontation Clause because the defense called Dr. Utkiewicz to testify from his report and Lana's statement to Dr. Utkiewicz was set forth on the face of report.  The government argues that Lana's statements to Judge Casey, on January 19, 2002, regarding the 1999 suicide attempt and her statement made to EMT Lemmerling did not violate the Confrontation Clause because they were not offered for the truth of the matter asserted, but to show Lana's state of mind with respect to suicide and to impeach the opinion of Boretsky's expert - Dr. Weinapple, who had reviewed these statements - that Lana was a high risk for suicide on March 3, 2002, the date of her death, in part because of her prior suicide attempt.

Citing Tennessee v. Street, 471 U.S. 409, 414 (1985), the Crawford Court noted that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  541 U.S. at 59 n.9.  In Tennessee v. Street, the defendant testified that his confession was coerced in that it "was derived from a written statement that Peele [, a non-testifying co-defendant,] had previously given the Sheriff [and that the Sheriff] read from Peele's statement and directed [defendant] to say the same thing."  Street, 471 U.S. at 411.  Because there were differences between the two confessions, the prosecutor had the Sheriff read Peele's confession.  The Supreme Court found that admission of Peele's confession did not violate the Confrontation Clause:

63

In this case, by contrast, the prosecutor did not introduce Peele's out-of-court confession to prove the truth of Peele's assertions. Thus, as the Court of Criminal Appeals acknowledged, Peele's confession was not hearsay under traditional rules of evidence.  In fact, the prosecutor's nonhearsay use of Peele's confession was critical to rebut respondent's testimony that his own confession was derived from Peele's. Before the details of Peele's confession were admitted, the jury could evaluate the reliability of respondent's confession only by weighing and comparing the testimony of respondent and Sheriff Papantoniou. Once Peele's statement was introduced, however, the jury could compare the two confessions to determine whether it was plausible that respondent's account of the crime was a coerced imitation.

The nonhearsay aspect of Peele's confession - not to prove what happened at the murder scene but to prove what happened when respondent confessed - raises no Confrontation Clause concerns. The Clause's fundamental role in protecting the right of cross-examination was satisfied by Sheriff Papantoniou's presence on the stand. If respondent's counsel doubted that Peele's confession was accurately recounted, he was free to cross-examine the Sheriff. By cross-examination respondent's counsel could also challenge Sheriff Papantoniou's testimony that he did not read from Peele's statement and direct respondent to say the same thing. In short, the State's rebuttal witness against respondent was not Peele, but Sheriff Papantoniou.

*    *    *

The State's most important piece of substantive evidence was respondent's confession.  When respondent testified that his confession was a coerced imitation, therefore, the focus turned to the State's ability to rebut respondent's testimony.  Had the prosecutor been denied the opportunity to present Peele's confession in rebuttal so as to enable the jury to make the relevant comparison, the jury would have been impeded in its task of evaluating the truth of respondent's testimony land handicapped in weighing the reliability of his confession.   Such a result would have been at odds with the Confrontation Clause's very mission - to advance the accuracy of the truth-determining process in criminal trials.

<u>Tennessee v. Street</u>, 471 U.S. at 413-415 (footnote, internal quotation marks and citations omitted).

  Last year, the Third Circuit granted a certificate of appealability where the District Court had denied habeas relief on Adamson's Confrontation Clause claim that the state violated his

64

right by introducing confessions of his alleged accomplices for the purpose of impeaching

Adamson's testimony that his own confession had been fabricated by a police officer.  See

Adamson v. Cathel, 633 F.3d 248 (3d Cir. 2011).  The Third Circuit held that the admission of

the accomplices' statements without a limiting instruction was contrary to Tennessee v. Street

and that the error was not harmless under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

> Our conclusion is that the presentation at Adamson's trial of portions of his
> accomplices' incriminating statements, without a limiting instruction, was
> contrary to the Supreme Court's clearly established precedent in Street, which
> required such an instruction.  We further conclude that the accomplice statements,
> combined with the lack of a limiting instruction, had a substantial and injurious
> effect of the jury's verdict.

Adamson, 633 F.3d at 256.

The Third Circuit noted that, in Street, "'the trial judge twice informed the jury that it was

admitted 'not for the purpose of proving the truthfulness of his statement, but for the purpose of

rebuttal only.'  [Street] at 412, 105 S.Ct. 2079.  The trial court included a similar limiting

instruction in its final instructions to the jury."  Adamson, 633 F.3d at 257.  The Third Circuit

determined that the Appellate Division's ruling was contrary to clearly established Supreme

Court precedent because

> Street makes clear that a jury's understanding of the distinction between
> substantive and impeachment uses of inculpatory evidence cannot be taken for
> granted.  An appropriate limiting instruction is necessary to prohibit jury misuse
> of such evidence.  Of particular importance here, the presence of such an
> instruction was essential to the holding in Street.

Adamson, 633 F.3d at258 (footnote omitted).

Here, Lana's statements were admitted not for the purpose of proving the truth of the

matter asserted, but for the purpose of rebuttal.[11]  The <u>Adamson</u> Court noted in a footnote that

"[n]onhearsay use of statements generally raises no Confrontation Clause concerns . . .  But we

and our sister circuits have acknowledged <u>Street</u>'s teaching that a limiting instruction is

necessary where, as here, nonhearsay use is made of expressly incriminating statements."

<u>Adamson</u>, 633 F.3d at 259 n.8.  Because the trial judge in Boretsky's case did not expressly

---

[11]  <u>See</u> <u>United States v. Hernandez</u>, 306 Fed. App'x 719, 722 (3d Cir. 2009) (admission of
telephone calls made from prison by co-defendants did not violate the Confrontation Clause
"because the government used the statements attributed to Brown, Johnson, and Mines not to
demonstrate the truth of anything asserted, but only to rebut their claims that they did not
previously know each other and were randomly arrested in Philadelphia that night"); <u>United
States v. Cruz-Diaz</u>, 550 F. 3d 169, 179 (1st Cir. 2008) ("[T]he district court admitted Cruz's
out-of-court statement not to prove the truth of the matter asserted but to rebut Ayala's attempt to
cast doubt on the integrity of the government's investigatory efforts"); <u>United States v. Jimenez</u>,
513 F. 3d 62, 81 (3d Cir. 2008) ("Nonhearsay use of evidence as a means of demonstrating a
discrepancy does not implicate the Confrontation Clause"); <u>United States v. Lore</u>, 430 F. 3d 190,
209 (3d Cir. 2005) ("[T]estimonial statements are admissible without prior cross-examination if
they are not offered for their truth"); <u>United States v. Logan</u>, 419 F. 3d 172, 178 (2d Cir. 2005)
("Since Gordon's and Gabbriellini's statements were not offered to prove the truth of the matter
asserted, introducing them through Sergeant Sandy's third-party testimony did not violate the
Confrontation Clause"); <u>Adams v. Holland</u>, 168 Fed. App'x 17, 20 (6th Cir. 2005) ("Because co-
defendant Crowell's statement was admitted via Detective Smith solely for the non-hearsay
purpose of impeachment, it raises no Confrontation Clause concerns") (citation and internal
quotation marks omitted); <u>United States v. Johnson</u>, 119 Fed. App'x 415, 419 (2005) (<u>Crawford</u>
contains "a clear expression of the Supreme Court's intent to retain the distinction between
testimonial and non-testimonial statements in our Sixth Amendment jurisprudence" and
defendant's "argument that the Confrontation Clause necessarily imposes the same requirements
for admitting non-testimonial statements as it does for testimonial statements is misguided");
<u>United States v. Hendricks</u>, 395 F. 3d 173, 183 (3d Cir. 2005) ("We thus hold that if a Defendant
or his or her coconspirator makes statements as part of a reciprocal and integrated conversation
with a government informant who later becomes unavailable for trial, the Confrontation Clause
does not bar the introduction of the informant's portions of the conversation as are reasonably
required to place the defendant or coconspirator's nontestimonial statements into context");
<u>United States v. Trala</u>, 386 F. 3d 536, 544-45 (3d Cir. 2004), <u>vacated on other grounds</u>, <u>Trala v.
United States</u>, 546 U.S. 1086 (2006) (finding no Confrontation Clause violation where out-of-
court statements were not introduced for their truth).

instruct the jury that it could not use Lana's statements for the purpose of proving the truthfulness, but for the purpose of rebuttal only, the Appellate Division's rejection of Boretsky's Confrontation Clause claim was contrary to Street, as interpreted by Adamson.

As the Appellate Division noted in Boretsky's case, errors under the Confrontation Clause are subject to harmless error analysis. See Adamson, 633 F.3d at 259-61; see also Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986); United States v. Hinton, 423 F. 3d 355, 362-63 (3d Cir. 2005). The Appellate Division found that, although there was a violation of the Confrontation Clause, the error was harmless:

> We regard the taped statement, itself, to have been cumulative in respect of the evidence already offered through the examination and cross-examination of the treating physician and the psychiatric expert. Its erroneous admission was harmless error. Similarly, the testimony of the State's rebuttal witness [, Lemmerling,] was also cumulative in the same sense, and any error that may have resulted from its admission was also harmless.

Boretsky, 2008 WL 4057972 at *8.

This Court must consider whether the unrestricted introduction of Lana's statements was harmless or whether it resulted in actual prejudice to Boretsky. See Brecht v. Abrahamson, 507 U.S. 619 (1993). "[A]n error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." Fry v. Pliler, 551 U.S. 112, 116 (2007). "If, when all is said and done, the [court's] conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." O'Neal v. McAninch, 513 U.S. 432, 437-38 (1995) (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)).

Here, the state's case against Boretsky rested primarily on the medical examiner's testimony that, given the location and trajectory of the knife, and the presence of defensive

67

wounds on both of Lana's hands, the stab wound was not self-inflicted.  As the Appellate

Division found, the admission of Lana's statements was cumulative.  The defense called Dr.

Utkiewicz, who testified not from recollection but from the physician notes, and the prosecutor

simply brought out Lana's statement as set forth in the physician note.  The defense called Dr.

Weinapple, who testified that he had considered the 1999 suicide attempt, Lemmerling's report,

and the transcript of Lana's telephone conversation with Judge Casey, in formulating his expert

opinion that Lana was a high risk for suicide.  The prosecutor cross-examined Weinapple with

respect to Lana's statements which could be interpreted as indicating that Lana cut her wrist in

1999 to stop Boretsky from abusing her or to get help for the abuse.  Lana's statements merely

clarified her state of mind at the time she cut her wrist.  Furthermore, unlike the confessions of

the co-defendants in Street and Adamson, which directly implicated them in the crimes for which

they were being tried, in this case, Lana's statements did not directly implicate Boretsky in

Lana's murder.  This Court holds that the error in admitting Lana's statements without an

instruction limiting their use was harmless.  Accordingly, Boretsky is not entitled to habeas relief

on the Confrontation Clause grounds.

## H.  Certificate of Appealability

This Court denies a certificate of appealability because Petitioner has not made "a

substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2).  See

Miller-El v. Cockrell, 537 U.S. 322 (2003).

68

## V.  CONCLUSION

Based on the foregoing, the Court denies Boretsky's motion to amend, dismisses the Petition, and denies a certificate of appealability.


      s/Freda L. Wolfson   
      **FREDA L. WOLFSON, U.S.D.J.**


Dated:   February 29,  2012